PEOPLE *v.* McMURCHY.

1. INDICTMENT AND INFORMATION—SUFFICIENCY—NEGLIGENT HOMI-
CIDE—STATUTES.
    Information charging defendant with negligent homicide under
    Act No. 98, Pub. Acts 1921, *held,* sufficient to show that
    defendant was negligent within the purview of the statute,
    although it does not charge that he was driving at an im-
    moderate rate of speed, considering traffic conditions at time
    and place of offense.

2. STATUTES—CONSTITUTIONAL LAW—TITLE OF ACT—NEGLIGENT
HOMICIDE.
    Title of Act No. 98, Pub. Acts 1921, defining crime of negli-
    gent homicide when committed by operation of vehicle, and
    prescribing penalty therefor, sufficiently expresses purpose
    of act, although it does not state that the crime of negligent
    homicide is included within every crime of manslaughter.

3. SAME—IMMODERATE SPEED OF VEHICLE.
    Inclusion in said act of provision in regard to immoderate speed
    is proper, since it in no way affects speed limit laws, viola-
    tion of which is punishable under statutes regulating them;
    "immoderate" being commonly defined as "not within rea-
    sonable limits."

4. HOMICIDE—CRIMINAL LAW—NEGLIGENCE—NEGLIGENT HOMICIDE.
    If vehicle, while being driven at immoderate or unreasonable
    rate of speed, kills a person, the driver is guilty of negligence,
    and the killing is negligent homicide.

5. CONSTITUTIONAL LAW—STATUTES—COURTS MAY NOT BE DIVESTED
OF JUDICIAL POWER TO DIRECT VERDICT.
    Legislature may not divest courts of their judicial power, and
    statute that takes away power of court to direct verdict is
    unconstitutional as unwarranted interference with judicial
    power.

6. CRIMINAL LAW—DIRECTED VERDICT.
    Judge has power to direct verdict in criminal case.

Homicide by negligent operation of automobile, see annotation
in L. R. A. 1918B, 954.

7. CONSTITUTIONAL LAW—STATUTES.

A law is unconstitutional that divests trial judge of right to apply the law and direct verdict when there is no dispute over facts.

8. SAME—OBJECTIONABLE WORDS MAY BE OMITTED AND ACT SUSTAINED.

The words ''shall be a question of fact for the jury,'' may and should be omitted from section 3, Act No. 98, Pub. Acts 1921, defining negligent homicide when committed by operation of vehicle, and when so omitted said section is not unconstitutional, since objectionable words do not affect the definition or punishment of the crime.

9. SAME.

Constitutionality of a law that is complete in itself without certain objectionable provisions that may be omitted will remain constitutional if such objectionable parts are omitted.

10. SAME—ACT MAY BE UPHELD AND OBJECTIONABLE WORDS OMITTED.

An act will be upheld which is complete in itself, notwithstanding certain clauses that are unconstitutional and should be omitted.

11. SAME—CONSTRUCTION OF STATUTE—INTENT.

The words ''in its discretion,'' in section 2, Act No. 98, Pub. Acts 1921, defining negligent homicide when committed by operation of vehicle, were not intended to give jury right to disregard instructions of trial judge, and have no such meaning, but jury must follow instructions of judge.

12. SAME—CRIMINAL LAW—OBJECTIONS WITHOUT MERIT.

Objection that one charged with negligent homicide under Act No. 98, Pub. Acts 1921, would not know how to plead, and that judge would not know whether to accept plea of guilty, held, without merit.

13. HOMICIDE—CRIMINAL LAW—NEGLIGENT HOMICIDE DETERMINED BY FACTS OF CASE.

Crime of negligent homicide, like that of involuntary manslaughter, is determined by the facts in each case, and the rule to be applied is not matter of conjecture but positive one.

14. CONSTITUTIONAL LAW—POLICE POWER—STATUTES.

The legislature, in exercise of its police power, in order to preserve health, morals, and safety, may constitute something

to be a crime that theretofore was not criminal, and may impose criminal responsibility for a tort that theretofore carried with it only civil liability.

15. NEGLIGENCE—CRIMINAL AND CIVIL LIABILITY.

One may be civilly and criminally responsible for negligence which causes death, though there may be some factors that would discharge one from liability for civil negligence that would not act as a release from criminal negligence.

16. SAME—DEFINED GENERALLY.

Negligence can be defined only by general rules as consisting of want of reasonable care, or in failure of duty which a person of ordinary prudence should exercise under all the existing conditions in view of probable injury.

17. SAME—SAME EVIDENTIARY FACTS MAY PROVE BOTH CIVIL AND CRIMINAL LIABILITY.

Same evidentiary facts required to prove civil liability for negligence may be used to prove criminal liability, although certain defenses, such as contributory negligence, would discharge one from civil liability, but not from criminal liability.

18. CONSTITUTIONAL LAW—"DUE PROCESS" CLAUSE APPLIES TO CIVIL AS WELL AS CRIMINAL LIABILITY.

"Due process" clause of Constitution refers to civil as well as criminal liability—to taking of property as well as liberty— so that, as civil liability is determined by certain rules, so, also, may criminal liability be determined by similar rules.

19. NEGLIGENCE—STATUTES—NEGLIGENT HOMICIDE.

"Negligence," within the meaning of Act No. 98, Pub. Acts 1921, defining crime of negligent homicide when committed by operation of vehicle, is not open to the objection that it is too indefinite, since its meaning is definite and well known in law.

20. STATUTES—NEGLIGENT HOMICIDE—CONSTITUTIONAL LAW.

The negligent homicide act (Act No. 98, Pub. Acts 1921) does not suspend or repeal existing statutes governing operation of automobiles, does not deprive one of life, liberty, or property without due process of law, is not an *ex post facto* law, and the law of any particular cause can be declared or known before the offense described in the act has been committed, nor does it withhold information from accused as to nature of

accusation against him, or delegate legislative powers to jury, or give a judicial department of government any legislative powers.

21. JUDGMENT—COURTS—PRECEDENTS—CONSTITUTIONALITY OF ACT UPHELD BY EQUALLY DIVIDED COURT BECOMES PRECEDENT.

The validity of an act of the legislature should not be subject to the general rule that decision by an equally divided court affirms the judgment but constitutes no precedent, but where an act has been held constitutional by an equally divided court, said decision is to be held to be a precedent in support of the constitutionality of the act whether the question is presented to the Supreme Court upon a judgment in favor of or against its validity. Per BUTZEL, POTTER, SHARPE, NORTH, and FEAD, JJ.

Error to the Recorder's Court for the City of Detroit; Skillman (W. McKay), J. Submitted October 17, 1929. (Docket No. 148, Calendar No. 34,425.) Decided January 17, 1930.

Information was filed against John G. McMurchy charging him with violating Act No. 98, Pub. Acts 1921, the negligent homicide law. From an order quashing the information on the ground of unconstitutionality of the act, the people bring error. Reversed.

*Wilber M. Brucker,* Attorney General, *Harold J. Waples,* Assistant Attorney General, *James E. Chenot,* Prosecuting Attorney, *P. J. M. Hally, Jr.,* Assistant Prosecuting Attorney, and *Alex. K. Gage,* Assistant Prosecuting Attorney, for the people.

*Chawke & Sloan* and *John Hal Engel,* for defendant..

BUTZEL, J. Act No. 98, Pub. Acts 1921 (Comp. Laws Supp. 1922, § 15226 [2–4]), reads as follows:

"An act to define the crime of negligent homicide, when committed by the operation of a vehicle, and to prescribe penalties for said crime.

"*The People of the State of Michigan enact:*

"SECTION 1. Every person who, by the operation of any vehicle at an immoderate rate of speed or in a careless, reckless or negligent manner, but not wilfully or wantonly, shall cause the death of another, shall be guilty of the crime of negligent homicide and upon conviction shall be sentenced to pay a fine not exceeding one thousand dollars, or to undergo imprisonment in the State prison for a period not exceeding five years, or by both such fine and imprisonment in the discretion of the court.

"SEC. 2. The crime of negligent homicide shall be deemed to be included within every crime of manslaughter charged to have been committed in the operation of any vehicle, and in any case where a defendant is charged with manslaughter committed in the operation of any vehicle, if the jury shall find the defendant not guilty of the crime of manslaughter such jury may in its discretion render a verdict of guilty of negligent homicide.

"SEC. 3. In any prosecution under this act, whether the defendant was driving at an immoderate rate of speed shall be a question of fact for the jury and shall not depend upon the rate of speed fixed by law for operating such vehicle.

"Approved April 28, 1921."

The provisions of this act were considered by this court in the case of *People* v. *Campbell,* 237 Mich. 424. It was held that the offense that this statute defines is homicide caused by more than slight and less than gross negligence.

This act was again under consideration by this court in the case of *People* v. *Maki,* 245 Mich. 455. The court held that the information under this law should set out all facts in regard to the offense with

such particularity so as to inform the accused of exactly what constituted the negligence. In the *Maki Case* the validity of the act was also questioned. The decision of the lower court upholding the constitutionality of the act was affirmed, but only by an evenly divided court. The constitutionality of the act is again assailed in the present case, which comes up from the recorder's court of the city of Detroit on a writ of error.

An information was filed against respondent charging that on July 23, 1928, by operation of his automobile in a careless, reckless, and negligent manner, but not wilfully and wantonly, he caused the death of Caroline Plunkett, etc. The details of the alleged homicide are set forth with full particularity. The information states that respondent was driving at a rate of 35 miles an hour; that he did not have his automobile under control so as to be able to slow down, stop, or turn aside said automobile upon approaching pedestrians and others lawfully upon the highway and the intersecting streets; that he did not give any signal of his approach; that he did not slow down his automobile upon approaching the intersection at which Caroline Plunkett was lawfully driving her automobile and as a result thereof, in a careless, reckless, and negligent manner drove his automobile with such force and violence against the automobile driven by said Caroline Plunkett that he inflicted upon her divers injuries from which she died. The information is complete in every detail. Although it does not charge that respondent was driving at an immoderate rate of speed, considering traffic conditions at the time and place of the offense, it does show that he was negligent within the purview of the statute.

A motion was made to quash the indictment. All objections raised as to the insufficiency of the testimony produced before the examining magistrate having been waived, the sole question raised is the constitutionality of the act.

The objections made to the act are numerous. It was contended on behalf of the respondent:

(1) That the purpose is not sufficiently expressed by the title;

(2) That the act embraces more than one object;

(3) That section 3 confers judicial powers upon the jury and delegates to them the power to sustain or repeal existing statutes governing the operation of automobiles, particularly the motor vehicle laws of the State of Michigan;

(4) That it gives the jury legislative powers;

(5) That it gives to the jury the power to create the offense and then determine whether the defendant is guilty or not; and

(6) That it retains the common-law offense of manslaughter without any notice thereof set forth in the title.

It is further claimed that the act violates the Constitutions of the United States and the State of Michigan in that it is so indefinite and uncertain as to constitute deprivation of life, liberty, or property without due process; that the act is *ex post facto;* and that the accused cannot be informed of the accusation against him because the law governing any particular offense can not be declared until the offense described in the act has been committed.

The trial court stated that because of the *Maki Case,* doubt had arisen as to the constitutionality of the act, and for this reason a very large number of negligent homicide cases were being held for trial pending a further expression of this court. He,

therefore, rendered an immediate opinion so that an appeal could be taken to this court. In a written opinion, he sustained the motion to quash, and held that the act was unconstitutional. He based his ruling on the grounds that, under this act, drivers of cars never would know whether they are guilty or not until the jury should pass upon their guilt after a fatal accident occurred; that the magistrate to whom the request for a warrant should be presented would not know whether the rate of speed employed by the vehicle that caused the fatal accident was a moderate one or not, and would be obliged to issue the warrant; that it would be mandatory for the trial judge to submit the case to the jury for the reason that the jury alone would have the right to determine whether the rate of speed was moderate or immoderate; that the accused would not know how to plead; that he would not understand the nature of the offense for which he was charged; that it gives legislative powers to the jury; that it gives the jury the power to suspend the laws governing the speed at which vehicles may be operated under the laws of the State of Michigan; that the act covers more than one subject, and that the purpose of the act is not fully set forth in the title thereof.

The purpose of the act is sufficiently expressed in the title. The purport of the act is fully covered. There is nothing in the title to which the provisions of the act are not germane, auxiliary, or incidental. The clause in regard to involuntary manslaughter in no way changes the common-law crime of manslaughter. There is no general statutory enactment defining manslaughter. Therefore, there is no statute to repeal or amend. It is not necessary to state in the title of the act that the crime of negligent homicide is included within every crime of manslaughter. The title, which states that it defines the

crime of negligent homicide, is sufficient and complete.

The inclusion of the provision in regard to immoderate speed is proper. It in no way affects the speed-limit laws, the violation of which is punishable under the statutes regulating them. While it is permissible to drive within certain limits of speed, the law provides that such speed must always be at a prudent and reasonable rate and not greater than will permit the driver to stop his car within the assured clear distance ahead. The speed-limit law provides for the punishment for the violation of its provisions. It does not provide for the additional criminal or civil liability of one who violates the law and in so doing commits homicide. One may be guilty of murder and also of another crime that he commits while in the act of murder. If a person drives at a rate of speed forbidden by the speed-limit laws, he would be punishable under such laws. If he commits homicide, he may be punishable under the act defining negligent homicide.

The commonly-accepted definition of "immoderate" is: *"Not within reasonable limits."* If one drives at a rate of speed that is not reasonable, he is driving at an immoderate rate of speed and not within reasonable limits. If under those circumstances he kills a person, he is guilty of negligence. The term "immoderate speed" constitutes a form of negligence, and may result in damage to person or property. If it causes death, it is negligent homicide. For this reason, the entire discussion in this opinion in regard to negligence is also applicable to negligent homicide by one driving at an immoderate rate of speed.

The law is further attacked on the ground that a prosecuting officer of this State, when requesting the issuance of a warrant under this act, and the

magistrate to whom such request is presented, would be bound to issue a warrant for the arrest of the accused even though there might be an honest belief that no crime had been committed. If a crime has been committed, and there is sufficient evidence to secure a conviction, there is no question as to their plain duty in the premises—to issue a warrant. If the evidence shows that no crime has been committed, or there is not sufficient evidence on which to convict, they should act in the same manner as when other charges are laid before them. This is also true in regard to the further proceedings before the court.

It is charged that all discretionary powers are removed from the trial judge. This is partly true in respect to the method of proving an immoderate rate of speed, if the words "shall be a question of fact for the jury" are not omitted from the last section of the act. In the present case respondent was charged with driving in a reckless, careless, and negligent manner, and causing death thereby. He was not charged with driving at an immoderate rate of speed. Inasmuch, however, as the constitutionality of the act is being questioned, it is proper to discuss all of the provisions of the act. The third section of the act provides that the question of whether the defendant "was driving at an immoderate rate of speed shall be a question of fact for the jury." The legislature may not divest the courts of their judicial power, and a statute that takes away a power of the court to direct a verdict is unconstitutional. It is an unwarranted interference with the judicial power by the legislature. In a criminal case a judge has the power to direct a verdict. *People* v. *Neumann,* 85 Mich. 98; *People* v. *Minney,* 155 Mich. 534, 536; *People* v. *Berridge,* 212 Mich.

576, 580; *People* v. *Damskey,* 180 Mich. 664. The trial judge retains full charge of the trial of a criminal case. Under the new criminal code he has greater powers and duties than theretofore. He may instruct the jury both as to the law and facts. He may make such comments in regard to the facts as he deems proper. A law is unconstitutional that divests the trial judge of the right to apply the law and direct a verdict when there is no dispute over the facts. *Bielecki* v. *United Trucking Co.,* 247 Mich. 661. However, the inclusion of the words "shall be a question of fact for the jury" does not make the act or even the section fatally defective, provided the quoted words may be omitted without destroying the purpose and completeness of the act. The objectionable words do not affect the definition or punishment of the crime. These words may be and should be omitted, so that the third section of the act shall read:

"In any prosecution under this act, whether the defendant was driving at an immoderate rate of speed shall not depend upon the rate of speed fixed by law for operating such vehicle."

The law is stated in 1 Cooley on Constitutional Limitations (8th Ed.), pp. 359–363, as follows:

"It will sometimes be found that an act of the legislature is opposed in some of its provisions to the Constitution, while others, standing by themselves, would be unobjectionable. So the forms observed in passing it may be sufficient for some of the purposes sought to be accomplished by it, but insufficient for others. In any such case the portion which conflicted with the Constitution, or in regard to which the necessary conditions have not been observed, must be treated as a nullity. Whether the other parts of the statute must also be adjudged void

because of the association must depend upon a consideration of the object of the law, and in what manner and to what extent the unconstitutional portion affects the remainder. A statute, it has been said, is judicially held to be unconstitutional, because it is not within the scope of legislative authority; it may either propose to accomplish something prohibited by the Constitution, or to accomplish some lawful, and even laudable object, by means repugnant to the Constitution of the United States or of the State. A statute may contain some such provisions, and yet the same act, having received the sanction of all branches of the legislature, and being in the form of law, may contain other useful and salutary provisions, not obnoxious to any just constitutional exception. It would be inconsistent with all just principles of constitutional law to adjudge these enactments void because they are associated in the same act, but not connected with or dependent on others which are unconstitutional. Where, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning, that it cannot be presumed the legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall. The point is not whether they are contained in the same section; for the distribution into sections is purely artificial; but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained. The difficulty is in determining whether

the good and bad parts of the statute are capable of being separated within the meaning of this rule. If a statute attempts to accomplish two or more objects, and is void as to one, it may still be in every respect complete and valid as to the other. But if its purpose is to accomplish a single object only, and some of its provisions are void, the whole must fail unless sufficient remains to effect the object without the aid of the invalid portion. And if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect the legislature would not pass the residue independently, then if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them.''

This has always been the law of this State. *People* v. *Eberle,* 167 Mich. 477. The act with the objectionable words eliminated is complete in itself, capable of being carried out without reference to the words that attempt to take away from the judge his judicial right and obligation. The act is otherwise valid and constitutional. The constitutionality of a law that is complete in itself, without certain provisions that may be omitted, will remain constitutional if such objectionable parts are omitted. *In re Wilson,* 160 Mich. 42; *People* v. *Eberle, supra; Roberts* v. *Atlantic Oil Producing Co.,* 295 Fed. 16 (certiorari denied in 265 U. S. 582 [44 Sup. Ct. 456]); *People* v. *Kenney,* 96 N. Y. 294; *Berea College* v. *Kentucky,* 211 U. S. 45 (29 Sup. Ct. 33). The case of *Gatewood* v. *North Carolina,* 203 U. S. 531 (27 Sup. Ct. 167), upheld a statute forbidding the opening or maintaining of a bucket shop, which contained unconstitutional clauses with reference to a *prima facie* presumption of guilt. Notwithstanding these clauses,

the balance of the act was held to be constitutional. In *Brazee* v. *Michigan,* 241 U. S. 340 (36 Sup. Ct. 561, Ann. Cas. 1917 C, 522), the court held that it was not necessary to go into the constitutionality of certain clauses of an act where the act was severable and defendant had been convicted under a part of the act, the constitutionality of which could not be questioned. An act will be upheld which is complete in itself notwithstanding certain clauses that are unconstitutional and should be omitted. *Loeb* v. *Columbia Township Trustees,* 179 U. S. 472 (21 Sup. Ct. 174); *Butts* v. *Merchants & Miners Transportation Co.,* 230 U. S. 126 (33 Sup. Ct. 964).

Some question may arise whether the words "in its discretion" in the second section of the act give the jury the right to disregard the instructions of the judge and thus infringe upon the rights and obligations of the trial judge. We hold that these words have no such meaning, and the jury must follow the instructions of the trial judge.

It is further claimed that a person charged with negligent homicide would not know how to plead, and that a judge would not know whether to accept a plea of guilty or not. This is a captious argument. The accused would know whether he had killed. He should know whether he had been driving at an immoderate rate of speed or in a careless, reckless, or negligent manner. If he did not know, he would stand mute. He would not be apt to plead guilty without stating the circumstances to the judge, who would tell him how to plead.

The crime of negligent homicide, like that of involuntary manslaughter and the many forms of crime set forth in the *Maki Case* in the opinion upholding the constitutionality of the law, is determined by the facts in each case, and the rule to be

applied to it is not a matter of conjecture but a positive one.

We are not concerned with whether the term ''negligent homicide'' was adopted as a euphemism for the more harsh term of ''involuntary manslaughter of a lesser degree.'' Similar standards of measurement are used to determine the respective crimes. Evidently the fear of being convicted of the crime of involuntary manslaughter did not act as a deterrent to the large number of drivers who through negligence less than gross have caused death. There is no doubt but that the legislature was prompted to pass a law to curb reckless, careless, and negligent driving which caused death, in cases where the negligence was less than gross. The reason for the law has unfortunately been too well demonstrated both before and since its enactment. Public records of the Detroit police department show that the annual death rate from automobile accidents in that city has more than doubled during the past ten years. From January 1, 1922, to October 31, 1929, there have been 2,205 such deaths reported to the police department. In 1926 there were 327 such deaths; in 1927 there were 325; in 1928 there were 322; and for the first ten months of 1929, there were 294. A very large number of these deaths were caused by the negligence of automobile drivers. This does not include the very large number of nonfatal injuries which resulted from a similar cause. The records show that the same driver has killed two persons at different times in or near Detroit. Can it be said that the State is powerless in the premises, because no code of laws or rules can be drafted that will fit a multitude of variant circumstances surrounding each case?

It is claimed that a new and more ductile rule or yardstick is necessary to measure the degree of the crime or negligence in negligent homicide cases. *People* v. *Campbell,* 237 Mich. 424, 434. But following the simile, the same rule or yardstick that is used in measuring the amount of negligence that is gross may also be ruled off so as to show what is less than gross. A rule or yardstick may be spaced off both as to feet and inches. While degrees of crime or torts can not be measured with mathematical precision, nevertheless a rule or yardstick that is used to determine a certain quantity may also show whether it is less than such quantity.

The law is well settled that the legislature, in the exercise of its police power in order to preserve the health, morals, and safety, may constitute something to be a crime that theretofore was not criminal. It may impose a criminal responsibility for a tort that theretofore carried with it only civil liability.

"It is within the power of the State to enact laws creating and defining crimes against its sovereignty, regulating the procedure in the trial of those who are charged with committing them, and prescribing the character of the sentence which shall be awarded against those who have been found guilty." *Coffey* v. *Harlan County,* 204 U. S. 659, 662 (27 Sup. Ct. 305).

The law of manslaughter through negligence was established ages ago. It has changed but little since then. The law of manslaughter as it exists today has been adopted from the old English common law. The law of homicide through the negligent driving of a vehicle may be found in Hale's Pleas of the Crown (first published in 1736). We quote from the first American edition, volume 1, published in 1847, p. 475:

"A. drives his cart carelessly, and it runs over a child in the street, if A. have seen the child, and yet drives on upon him, it is murder; but if he saw not the child, yet it is manslaughter; but if the child had run cross the way, and the cart run over the child before it was possible for the carter to make a stop, it is *per infortunium,* and accordingly this direction was given by us at Newgate sessions in 1672 and the carter convicted of manslaughter.

"If a man or a boy riding in the street whip his horse to put him into speed, and run over a child and kill him, this is homicide, and not *per infortunium,* and if he rid so in a press of people with intent to do hurt, and the horse had kild another, it had been murder in the rider.

"But if a man or boy riding in the street, and a by-stander whip the horse, whereby he runs away against the will of the rider, and in his course runs over and kills a child or man, it is chance-medley only, and in that case the jury ought not to find him *not guilty* generally, but the special matter; but yet, because the coroner's inquest, which stood untraversed, had found the special matter, the court received the verdict of *not guilty* upon the indictment by the grand inquest of murder, and the party confessed the indictment by the coroner, and had his pardon of course, and this was said by Lee secondary to be the course at Newgate, 1 Sept. 16 Car. 2. *Richard Pretty's Case.*"

In Foster, Crown Law (3d Ed., 1792), p. 263, § 4, tit. 2, chap. 1, it was said:

"A person driving a cart or other carriage happeneth to kill. If he saw or had timely notice of the mischief likely to ensue, and yet drove on, it will be murder; for it was wilfully and deliberately done. Here is the heart regardless of social duty, which I have already taken notice of. If he might have seen the danger, but did not look before him, it will be

manslaughter for want of due circumspection. But if the accident happeneth in such a manner that no want of due care could be imputed to the driver, it will be accidental death, and the driver will be excused.''

A number of English cases on homicide caused by the negligent driving of vehicles illustrate that under the common law the court considered whether ordinary caution was used; whether the vehicle was being driven at a reasonable rate of speed considering the condition of traffic; whether a driver was using due care, etc. It can be seen from these cases that the same questions that confront us in the present instance were considered by judge or jury in determining whether the crime had been committed.

In *Rex* v. *Walker,* 1 C. & P. 320 (1824), the defendant was driving a cart with two horses. There were no reins. The horses were cantering and the defendant was sitting in the front of the cart. The defendant saw the deceased and called twice to him to get out of the way. The fact that the deceased was drunk, however, and the rapid pace of the horses, prevented the deceased from so doing, and he was run over and killed. On an indictment for manslaughter, Garrow, B., laid down in his charge:

''That if a man drive a cart at an unusually rapid pace, whereby a person is killed, though he calls repeatedly to such person to get out of the way; if from the rapidity of the driving, or any other cause, the person cannot get out of the way time enough, but is killed, the driver is in law guilty of manslaughter; and that it is the duty of any man who drives any carriage, to drive it with such care and caution to prevent, as far as in his power, any accident or injury that may occur.''

In *Rex* v. *Timmins,* 7 C. & P. 499 (1836), the indict-

ment for manslaughter charged that the defendant so negligently drove an omnibus that it overturned and killed the deceased who was riding on top. Evidence showed that the defendant was racing with another 'bus. Patteson, J., in summing up, said:

"The question here is, whether you are satisfied that the prisoner was driving in such a negligent manner that by reason of his gross negligence, he had lost command of his horses? And that depends on whether the horses were unruly, or whether you believe that he had been racing with the other omnibus, and had so urged his horses that he could not stop them; because, however he might be endeavoring to stop them afterwards, if he had lost the command of them by his own act, he would be answerable; for a man is not to say, I will race along a road, and, when I am got past another carriage, I will pull up. If the prisoner did really race, and only when he had got past another omnibus endeavored to pull up, he must be found guilty; but if you believe that he was run away with, without any act of his own, then he is not guilty. The main questions are, were the two omnibuses racing? And was the prisoner driving as fast as he could, in order to get past the other omnibus? And had he urged his horses to so rapid a pace that he could not control them? If you are of that opinion, you ought to convict him; but if his horses ran away of their own accord, without any act of his, he is entitled to an acquittal."

In *Queen* v. *Dalloway,* 2 Cox, 273 (1847, Oxford Circuit, Crown Court), the prisoner was riding in his wagon standing up with the reins loose on his horse's back—not in the prisoner's hands. The deceased, a child of three years, ran in front of the wagon and was killed. The defendant was indicted for manslaughter. Earle, J., in summing up to the jury directed them:

"A party neglecting ordinary caution, and, by reason of that neglect, causing the death of another, is guilty of manslaughter; that if the prisoner had reins, and by using the reins could have saved the child, he was guilty of manslaughter; but that if they thought he could not have saved the child by pulling the reins, or otherwise by their assistance, they must acquit him."

In *Reg.* v. *Murray,* 5 Cox, 509 (1852, before the Dublin Commission Court), the defendant was driving his cart over a quay when it struck a nurse who was carrying an infant, so that the infant rolled under the wheels of the vehicle and was instantly killed. The indictment was for manslaughter and the evidence showed that the prisoner was in the driver's seat at the time and proceeding at a reasonable rate of speed. The defense urged the fact that the nurse paused momentarily and that the defendant expecting her to keep moving was taken unawares; and further, that since the street was full of people who had been witnessing the Lord Mayor's procession, it was very difficult to avoid hitting someone. The court said in charging the jury (p. 510):

"As to what has been urged by the counsel for the prisoner as to the crowded state of the streets, rendering it difficult to avoid an accident, I have to tell you that this unusual concourse of persons, instead of offering any extenuation for the prisoner, or diminishing the criminality of his careless driving, if you find it to have been such, would but be a circumstance to add to it, and that it was his duty, as well as of all driving upon such occasions, to take more than ordinary precautions against accidents, and to use more than ordinary diligence for the safety of the public. * * * The question which you have to try here is, I may say in a word, whether the death was caused by the careless and negligent driving of the prisoner, or was the result

of an accident which he could not reasonably foresee or provide against.''

The principles of law laid down in this country in regard to manslaughter through gross negligence in the main follow those of England. There are many authorities. We shall just refer to two of them. The law is well stated in the case of *Belk* v. *People,* 125 Ill. 584 (17 N. E. 744). The court said:

"The case made by the evidence fairly presented the question for determination, as to whether the collision was the result of the reckless and wanton failure of the plaintiffs in error, or some one or more of them, to control and manage the team of which they were in charge, or was the result of unavoidable mischance or accident.     *     *     *

"It is insisted by counsel for the defendants, that as there is a failure to show that they were active in inducing their horses to run at the place indicated, no criminal responsibility attaches to the defendants. This we think a misapprehension of the law. There can be but little distinction, except in degree of criminality, between a positive intent to do wrong and an indifference whether wrong is done or not. It is therefore said: 'Carelessness is criminal, and within limits supplies the place of the direct criminal intent' (1 Bish. Crim. Law [9th Ed.], § 313; *Com.* v. *Rodes,* 6 B. Mon. [45 Ky.] 171; Roscoe on Crim. Ev. [5th Amer. Ed.], pp. 710 *et seq.*). Every person driving upon the public highway, or in other places frequented by others, is bound to exercise reasonable care and caution to prevent injury to others. The law casts upon him the legal duty of observing such care and caution as is exercised by reasonable and prudent men under like circumstances. As a rule, the care required is to be proportioned to the danger. Hence, driving rapidly in an open country highway may not be negligence, while the same character of driving in a thronged

street or thoroughfare, or where there is known hazard to others, may be negligence in the highest degree. Wharton on Crim. Law [9th Ed.], §§ 353–355.''

Justice Cooley in *People* v. *Roby,* 52 Mich. 577, 579 (50 Am. Rep. 270), in referring to criminal manslaughter, said:

''I agree that as a rule there can be no crime without a criminal intent; but this is not by any means a universal rule. One may be guilty of the high crime of manslaughter when his only fault is *gross negligence;* and there are many other cases where mere neglect may be highly criminal. Many statutes which are in the nature of police regulations, as this is, impose criminal penalties irrespective of any intent to violate them; the purpose being to require a degree of diligence for the protection of the public which shall render violation impossible.''

The law of civil negligence also had its origin centuries ago. One may be civilly and criminally responsible for the negligence which causes death, though there may be some factors that would discharge one from liability for civil negligence but would not act as a release from criminal negligence. The method of determining negligence in both instances is the same. There is no code of rules that fits each and every case of civil negligence.

Dean Green in his article on The Negligence Issue, in 37 Yale Law Journal, 1029, says:

''It would be futile for the law to attempt to deal in detail by way of precise anticipatory rule with each of the infinite number of cases which can be classified as 'negligence' cases. The number of such situations in which the quality of conduct can be measured by standards stated in terms of conduct is relatively small. The torrents of pertinent factors

incident to any wholesale attempt along this line are beyond classification and statement. The qualities of personality are themselves numerous; their shadings are countless; the conduct of individuals is incalculable at present in its variety; the possible combinations of these are literally infinite, as infinite as space and time. The number of instances of conduct which could be labelled either as negligent or nonnegligent is beyond the limits of any catalog the law can make. So it is not surprising that in the face of infinity the law does exactly what other sciences do in like situations. It adopts a formula; a formula in terms which will permit its problems to be reduced to a graspable size. This formula, like many other formulas, tends quickly to become ritual and it would seem that it is only this ritual which holds the law's interest. This much it insists upon rigorously, but this is as far as the law's science goes in this direction. It seems to have no interest in the 'physical, mental and moral' qualities and characteristics of personality as such, nor in the qualities and characteristics of the 'ordinary prudent person.' And while it is intellectually stimulating to inquire into the intelligence, experience, powers of memory, observation, co-ordination, the reaction time, self-control, courage, skill, *ad infinitum,* which the law might require of defendants, such inquiry is rendered utterly without profit for the purposes of determining the negligent conduct of any particular defendant in any particular case. The law does not make any attempt to require any of them in any one or more combinations. A formula in these terms has not been written which can be relied on to fit a single defendant in a single case.''

As stated in this article, no precise anticipatory rules can be laid down that will govern with particularity each and every case of criminal or civil negligence. Negligence can only be defined by general

rules. It consists of a want of reasonable care or in the failure of duty which a person of ordinary prudence should exercise under all the existing circumstances, in view of the probable injury. *Detroit & M. R. Co.* v. *Van Steinburg,* 17 Mich. 99; *Michigan Central R. Co.* v. *Coleman,* 28 Mich. 440. Negligence has been defined in a general way in Michigan and in other States by so many hundreds of decisions, that the general rules have almost become postulates.

The very same evidentiary facts required to prove civil liability for negligence may be used to prove criminal liability. It is true that there may be certain defenses as contributory negligence, etc., which would discharge one from civil liability but not from criminal liability. The main constitutional objections made by respondent as to the act under consideration could be made to the rules establishing civil liability on account of negligence. It is just as much a violation of the due process clause of the Constitution to take property as it is to take the liberty of a person. The due process clause refers to civil as well as criminal liability, to the taking of property as well as liberty. If these objections are valid, then the jury exercises as much legislative power to determine civil liability as it does in determining criminal liability. The law governing civil liability for negligence is unquestioned. It has been settled by decisions going back hundreds of years. Just as we can ascertain civil liability by certain rules, so also can we determine criminal liability by similar rules.

An examination of the automobile speed laws of the 48 States discloses that in 10 statutes defining manslaughter include death caused by lack of "due caution and circumspection." Eleven States include under the crime of manslaughter death caused by

"culpable negligence." In 15 States, including some above referred to, manslaughter is defined as "killing a person without malice, etc., while doing an unlawful act," and it is further provided that driving "at a rate of speed that is not reasonable and proper," or words to that effect, shall be unlawful. In one State the statute provides that manslaughter shall consist of the killing of a person by "one engaged in perpetration of any crime or misdemeanor not amounting to a felony," instead of referring to an unlawful act. In 47 States of the Union and in the District of Columbia and Hawaii there are statutes which forbid driving "at a rate of speed greater than is reasonable and proper, having regard for the width, traffic, and use of the highway and in a manner so as to endanger property or the limb of any person." In some of the States the words "careful and prudent" are used. In others, words with a like meaning to those quoted are used.

The Texas code distinguishes "excusable homicide" from "negligent homicide" by stating that in the latter "the want of proper care and caution distinguishes this offense from excusable homicide. The degree of care and caution is such as a man of ordinary prudence would use under like circumstances" (Tex. Crim. Stat. 1925, Art. 1233). If the negligent homicide statute of Michigan is unconstitutional because of the objections raised in the case at issue, then similar objections may be raised as to the constitutionality of the speed laws of almost every State. Like objections may be made to the penal laws of all States that make it a felony to cause death through negligence.

The definition of negligence and of its various grades has come down to us through a multitude of decisions, and is neither vague, uncertain, or indefinite. The one opinion in the *Maki Case* adverse

to the constitutionality of the law contains excerpts from decisions in numerous cases. A reading of these decisions dispels the doubts as to the constitutionality of the statute here under consideration. These decisions held that certain statutes were void on account of indefiniteness. Such indefiniteness does not exist in the Michigan statute, whose constitutionality is being attacked. We have well-established precedents defining civil and criminal negligence. The distinction between the case at issue and those quoted in the *Maki Case* can be readily seen. We only make brief reference to them. In *United States* v. *Sharp,* Pet. C. C. 118 (27 Fed. Cas. p. 1041), the indictment was against several seamen for "making a revolt, endeavoring to make a revolt and for confining the master." The court stated that the word "revolt" was too indefinite; that it was not defined by statute or by any civil law or by any judicial decision to be met with in any reporter or any elementary writer upon law; and that the philologists gave so many and different definitions to the words that no one of them could be adopted, particularly for a crime as serious as the one charged. Obviously, the word "negligence" is not open to this objection. Its meaning is definite and well known.

In *Chicago, etc., R. Co.* v. *Dey,* 35 Fed. 866 (1 L. R. A. 744), and *Tozer* v. *U. S.,* 52 Fed. 917, the court held statutes to be illegal that provided for a penalty for an excessive railroad rate because the statutes did not in any way give a satisfactory manner in which to find out what such rate should be, and, therefore, the statutes were indefinite. Manifestly, these objections would not be applicable to the question of civil or criminal liability for negligence.

The next case referred to is that of *Railroad Commission of Indiana* v. *Railroad Co.,* 179 Ind. 255 (100

N. E. 852). An Indiana statute provided a penalty for operating a railroad without an approved block system for the control of train movements thereon. At that time there were three block systems in use, and there was no precise way of ascertaining which block system met with approval. The court held that the statute was indefinite. As a matter of fact, this uncertainty was removed by subsequent legislation. The law as it stood created a genuine quandary in which no exercise of sound judgment, forbearance, or caution could aid in the determination of how to observe the law. No such situation arises in determining what is civil or criminal negligence.

The next case referred to is *State* v. *Comeaux,* 131 La. 930 (60 South. 620); the statute attacked was one which provided punishment for "indecent assaults." The court held that the only crimes recognized under the laws of Louisiana were statutory ones and not those under the common law, and that there was no definition of the term "indecent assault." This reasoning would not apply to the law of negligence in Michigan.

*State* v. *Mann,* 2 Or. 238, construed a statute which forbade the use of gambling devices. Defendant was arrested for using "a gambling device," to wit, playing poker. The court held that the game of poker is specified by name as one of the devices prohibited by the statute; that a device must be tangible, etc. This decision can not in the remotest degree be related to the question of negligence.

In *Brown* v. *State,* 137 Wis. 543 (119 N. W. 338), the respondent was accused of failing to observe the State law in regard to registration, but the law, as the court held, was fatally defective in not definitely stating where the registration should take place. The reasoning in this decision can not affect the present case.

*United States* v. *Cohen Grocery Co.*, 255 U. S. 81 (41 Sup. Ct. 298, 14 A. L. R. 1045), was a case brought under the Lever Act, which made it "unlawful for any person wilfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries." The court shows that this was impossible; that so many elements arose in determining "rate or charge" that there was such a hopeless disagreement as to what the price should be, that the law was indefinite. The court called attention to the various judicial interpretations that had been put upon the act and the questions which had been raised by them, such as "market price," "the time of purchase," "length of time in stock," "what would amount to a fair and reasonable profit," etc., whether an advance in price from the time of purchase, whether a departure in war time from the scale of prices in times of peace, whether a greater price could be asked for goods purchased prior to an advance than for goods subsequently purchased at a greater cost, etc. The act was held to be unconstitutional on account of indefiniteness. We are not confronted with any such conditions in considering the negligent homicide law.

*International Harvester Co.* v. *Kentucky*, 234 U. S. 216 (34 Sup. Ct. 853), passed upon the constitutionality of a statute which prohibited certain combinations in restraint of trade and which forbade the raising or lowering of the price above or below the "real value" of the article. The court of appeals declared that the "real value" was its market value under fair competition and under normal market conditions. The Supreme Court held that this was too indefinite, for such a test would be entirely unworkable. The reasoning in this case can in no way

be applicable to the negligent homicide statute. In fact, the court so held when it stated in its opinion:

"We regard this decision as consistent with *Nash* v. *United States,* 229 U. S. 373, 377 (33 Sup. Ct. 780), in which it was held that a criminal law is not unconstitutional merely because it throws upon men the risk of rightly estimating a matter of degree—what is an undue restraint of trade. That deals with the actual, not with an imaginary condition other than the facts. It goes no further than to recognize that, *as with negligence,* between the two extremes of the obviously illegal and the plainly lawful there is a gradual approach and that the complexity of life makes it impossible to draw a line in advance without an artificial simplification that would be unjust. The conditions are as permanent as anything human, and a great body of precedents on the civil side coupled with familiar practice make it comparatively easy for common sense to keep to what is safe."

The excerpt from the opinion in the case of *Commonwealth* v. *Pentz,* 247 Mass. 500 (143 N. E. 322), states the law correctly as to the necessity for definiteness in a criminal statute which provided against the operating of a motor vehicle recklessly or by a driver while under the influence of intoxicating liquor or in a manner so that the lives or safety of the public might be endangered, etc. The court, in upholding the law as not being indefinite, said:

"To endanger the lives and safety of the public by the operation of an automobile on a public way is not an intangible and shadowy act. It has specific relation to possible contact with human beings. The objections to the statute are disposed of by what was said in *Nash* v. *United States,* 229 U. S. 373 (33 Sup. Ct. 780), at pages 376, 377: 'It is said that the crime thus defined by the statute contains in its

definition an element of degree as to which estimates may differ, with the result that a man might find himself in prison because his honest judgment did not anticipate that of a jury of less competent men. The kindred proposition that ''the criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable. There must be some definiteness and certainty,'' is cited from the late Mr. Justice Brewer sitting in the circuit court. *Tozer* v. *United States,* 52 Fed. 917, 919. * * * The law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. ''An act causing death may be murder, manslaughter, or misadventure, according to the degree of danger attending it'' by common experience in the circumstances known to the actor.' ''

In *Connally* v. *Construction Co.,* 269 U. S. 385 (46 Sup. Ct. 126), the term ''current wage'' for performing public work in the construction of a bridge was considered in construing the statute compelling the payment of the ''current wage'' in the locality. The court held that the terms were not certain, that the value of services varied with the work performed, efficiency of the workmen, etc. The court stated as follows:

''The question whether given legislative enactments have been thus wanting in certainty has frequently been before this court. In some of the cases the statutes involved were upheld; in others, declared invalid. The precise point of differentiation in some instances is not easy of statement. But it will be enough for present purposes to say generally that the decisions of the court upholding stat-

utes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them. *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497, 502 (45 Sup. Ct. 141); *Omaechevarria* v. *Idaho,* 246 U. S. 343, 348 (38 Sup. Ct. 323), or a well-settled common-law meaning, notwithstanding an element of degree in the definition as to which estimates might differ, *Nash* v. *United States,* 229 U. S. 373, 376 (33 Sup. Ct. 780); *International Harvester Co.* v. *Kentucky,* 234 U. S. 216, 223 (34 Sup. Ct. 853), or, as broadly stated by Mr. Chief Justice White in *United States* v. *Cohen Grocery Co.,* 255 U. S. 81, 92 (41 Sup. Ct. 298, 14 A. L. R. 1045), 'that, for reasons found to result either from the text of the statutes involved or the subjects with which they dealt, a standard of some sort was afforded.' "

In *Cline* v. *Frink Dairy Co.,* 274 U. S. 445 (47 Sup. Ct. 681), and *Small Co.* v. *American Sugar Refining Co.,* 267 U. S. 233 (45 Sup. Ct. 295), the questions involved were similar to those in the case of *United States* v. *Cohen Grocery Co., supra.* In the case of *Cline* v. *Frink Dairy Co.,* hereinafter quoted, the court properly distinguishes the difference between that case and the one in which the question of negligence is involved.

It will be found upon examination of all the cases referred to and from which quotations were given, with the exception of *Commonwealth* v. *Pentz, supra,* that there were involved questions of rates, prices, or words of such indefinite meaning that no legal definition could be found for them either in the statutes, common law, or the general understanding of the public. On the other hand, a statute imposing liability for negligence in driving an automobile at an immoderate rate of speed or in a manner so as

to constitute negligence, has been uniformly upheld by our courts, except in a very few instances.

The law of negligence has become part of the law of the land. It is distinctly understood. A statute analogous to the one under consideration has been on the United States statute books since the year 1838. It has been but slightly amended. It is entitled:

"An act to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam." 5 Stat. at Large, pp. 304, 306, § 12.

It reads as follows:

"*And be it further enacted,* That every captain, engineer, pilot, or other person employed on board of any steamboat or vessel propelled in whole or in part by steam, by whose misconduct, *negligence,* or inattention to his or their respective duties, the life or lives of any person or persons on board said vessel may be destroyed, shall be deemed guilty of manslaughter, and, upon conviction thereof before any circuit court in the United States, shall be sentenced to confinement at hard labor for a period not more than ten years."

As pointed out in the opinion upholding the constitutionality of the law in the *Maki Case,* there are many crimes on our statute books which must be defined by the use of words of a general and flexible meaning, and the existence or nonexistence of the essential elements of these crimes becomes a question of fact to be determined in each case. It is not possible to use any but general terms for describing the following statutory crimes: wilful, deliberate and premeditated killing; committing an assault with a deadly weapon; assault with intent to do

great bodily harm; assault with a gun, etc., or other
dangerous weapon; cruelly and unlawfully punish-
ing a child; going armed with an offensive and dan-
gerous weapon or instrument concealed on one's
person; committing a gross fraud or cheat; mali-
cious injury to property; abandonment of wife or
children without necessary and proper shelter, food,
etc.; drunkenness, intoxication, driving while intox-
icated; lewd and lascivious cohabitation; use of in-
decent language, etc.; crime, sabotage, violence or
other unlawful methods of terrorism; gross in-
decency; disorderly person; allowing a prisoner to
escape through negligence; lottery; resisting an
officer, etc. It is necessary to apply the rule of rea-
son or common understanding to many statutes in
order to carry out their purpose. *Standard Oil Co.*
v. *United States,* 221 U. S. 1 (31 Sup. Ct. 502, 34 L.
R. A. [N. S.] 834); *United States* v. *American
Tobacco Co.,* 221 U. S. 106 (31 Sup. Ct. 632). It,
however, is not even necessary to read anything into
the statute under consideration. The term "negli-
gence" is so well known, the elements so certain, the
definition so definitely settled, and the precedents so
many, that there is nothing indefinite whatsoever
about it. It might be highly desirable to define every
form of negligence in causing homicide in the use
and operation of an automobile, but the list would
be such a long one and would call for so many per-
mutations and combinations, that it would be far
from complete. It would lead into uncertainty and
confusion.

It is true (as set forth in the opinion sustaining
the constitutionality of the law in the *Maki Case*)
that the case of *State* v. *Lantz,* 90 W. Va. 738 (111
S. E. 766, 26 A. L. R. 894), held that a statute making
it a crime to operate an automobile around a curve

on a public road without having the same under control or without reducing the speed thereof to a reasonable and proper rate is void for uncertainty and indefiniteness. It was, however, held by this court in *People* v. *Dow,* 155 Mich. 115, 118, that a statute forbidding the driving of automobiles in excess of a certain speed in the "business portion" of cities was not so uncertain and indefinite as to render it void, as a violation of the due process clause of the Constitution. In fact, the overwhelming weight of authority in this country is to the effect that a statute such as the one under consideration does not violate any constitutional provisions.

"The validity of a statute prescribing a penalty for a given act of this character requires that the elements of the offense be stated with legal certainty. *State* v. *Carpenter,* 60 Conn. 97 (22 Atl. 497); *Commonwealth* v. *Pentz,* 247 Mass. 500 (143 N. E. 322); Huddy on Automobiles (8th Ed.), § 892; Berry on Automobiles (5th Ed.), § 1796.

"Various and conflicting decisions are found in different jurisdictions as to the validity of statutory provisions attacked for failure to meet this requirement. Thus in Texas, a statute making it an offense to drive automobiles other than in a careful manner, has been held void on this ground; *Russell* v. *State,* 88 Tex. Cr. 512 (228 S. W. 566); and in Georgia, a statute has been held void which prohibited driving so as to endanger the property or life or limb of any person. *Howard* v. *State,* 151 Ga. 845 (108 S. E. 513); *Carter* v. *State,* 12 Ga. App. 430 (78 S. E. 205). Both of these provisions would be held valid in this State.

"In most jurisdictions statutes will not be held void for uncertainty if a practicable or sensible effect may be given to them. 3 Blashfield Cyc. of Automobile Law, p. 2045, § 3. So, statutes prohibiting an unreasonable rate of speed are generally sus-

tained. *Ex parte Daniels,* 183 Cal. 636 (192 Pac.
442, 21 A. L. R. 1172); *People* v. *Beak,* 291 Ill. 449
(126 N. E. 201); *Gallaher* v. *State,* 193 Ind. 629 (141
N. E. 347, 29 A. L. R. 1059); *State* v. *Schaeffer,* 96
Ohio St. 215 (117 N. E. 220, L. R. A. 1918 B, 945,
Ann. Cas. 1918 E, 1137); Huddy on Automobiles
(8th Ed.), p. 57, § 63. In Massachusetts, a statute
has been sustained which makes it an offense to
drive so as to endanger the lives or safety of the
public. *Commonwealth* v. *Pentz,* 247 Mass. 500 (143
N. E. 322).

"Statutes prohibiting reckless driving, or driving
at a rate of speed which was unreasonable, under all
the conditions, are very generally and by the great
weight of authority, upheld. Huddy on Automobiles
(8th Ed.), p. 408, § 394, p. 1052, § 892.

"The offense of driving 'recklessly' in view of the
conditions, as set forth in our own statute, suffi-
ciently meets the requirements of definiteness and
certainty. *State* v. *Goetz,* 83 Conn. 437 (76 Atl. 1000,
30 L. R. A. [N. S.] 458). The word has a clear and
commonly understood meaning, so that one of ordi-
nary intelligence is not left in doubt as to its pur-
port. Though the speed limit formerly imposed in
this State has been removed, the term 'recklessly'
still remains definite. Its test does not lie in speed
alone, but in that and other circumstances which to-
gether show a reckless disregard of consequences.
The claim seems to be that the statute fails to state
with particularity the acts prohibited. Of such a
claim we have said: 'It would seem to require that
all general words used to indicate the offense * * *
should be particularly defined. * * * The objec-
tion overlooks the fact that the prohibited acts may
have a general name to characterize them, as well
understood without as with a definition.' *State* v.
*Carpenter,* 60 Conn. 97, 102 (22 Atl. 497).

"It will be seen that the same reasoning applies
to the offense of driving 'so as to endanger the prop-

erty or life or limb of any person.' " *State* v. *Andrews,* 108 Conn. 209 (142 Atl. 840).

To like effect are also: *Schultz* v. *State,* 89 Neb. 34 (130 N. W. 972, 33 L. R. A. [N. S.] 403, Ann. Cas. 1912 C, 495); *Mulkern* v. *State,* 176 Wis. 490 (187 N. W. 190); *State* v. *Goldstone,* 144 Minn. 405 (175 N. W. 892); *State* v. *Smith,* 29 R. I. 245 (69 Atl. 1061).

"On the other hand, where the statute is within legislative power, courts should be slow to say they cannot understand and enforce its provisions and should exhaust efforts at practical constructions before doing so. Some uncertainty is inseparable from law and life. The jury is our established tribunal for solving uncertainties in the application of law to life. The Magna Carta declared: 'No free man shall be taken or imprisoned * * * save by the lawful judgment of his peers. or the law of the land,' seeming to express content at a condemnation by either. Probably all common-law crimes were originally defined only by the common opinion of the people expressed in the verdicts of juries and judgments of courts. In civil matters today omitted stipulations in contracts are supplied by 'reasonable time' or 'substantial performance' judged of by a jury. In negligence cases juries are told that, while the law lays down a standard of 'reasonable and ordinary care and diligence,' exactly what acts the defendant should have done or refrained from, in the exercise of such diligence, is for their judgment. The defendant keeps or loses his money accordingly. Every code of criminal laws contains many vague definitions of crime." *United States* v. *Oglesby Grocery Co.,* 264 Fed. 691.

The principal constitutional objection raised in the case at issue was considered in *Miller* v. *Oregon,* 273 U. S. 657 (47 Sup. Ct. 344). The constitutionality of the Oregon statute was upheld by the United

States Supreme Court. No written opinion was filed in that case. Subsequently, however, the case was referred to and the reasons for upholding the constitutionality of the statute were fully set forth in *Cline* v. *Frink Dairy Co.,* 274 U. S. 445 (47 Sup. Ct. 681). In the latter case Chief Justice Taft said:

"On questions of confiscatory rates for public utilities, for instance, courts must examine in great detail the circumstances and reach a conclusion as to a reasonable profit. But this does not justify in such a case holding the average member of society in advance to a rule of conduct measured by his judgment and action in respect to what is a reasonable price or a reasonable profit. It is true that, on an issue like negligence, *i. e.,* a rule of conduct for the average man in the avoidance of injury to his neighbors, every one may be held to observe it either on the civil or criminal side of the court. It is a standard of human conduct which all are reasonably charged with knowing and which must be enforced against every one in order that society can safely exist. We said in the *Nash Case* (229 U. S. 373, 377, 33 Sup. Ct. 780): 'But apart from the common law as to restraint of trade thus taken up by the statute the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. "An act causing death may be murder, manslaughter, or misadventure according to the degree of danger attending it" by common experience in the circumstances known to the actor. * * * "The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct." 1 East, P. C. 262.' Following the authority in the *Nash Case,* we sustained in *Miller* v. *Oregon, per curiam,* 273 U. S. 657 (47 Sup. Ct. 344), a convic-

tion of manslaughter under a statute of Oregon, which made the following rule of conduct a standard of criminality:

" 'Every person operating a motor vehicle on the public highways of this State shall drive the same in a careful and prudent manner, not to exceed 30 miles per hour, and within the limit of incorporated cities and towns not to exceed 20 miles per hour, and at intersections and schoolhouses not to exceed 12 miles per hour, and in no case at a rate of speed that will endanger the property of another, or the life or limb of any person.' Ch. 371, General Laws of Oregon, 1921, § 2, subd. 16).

"The indictment was framed under the last clause of this statute. Such standard for the driver of an automobile on a highway is one to which it is neither harsh nor arbitrary to hold those criminally who operate such a possibly dangerous instrument of locomotion, and who are or ought to be aware of what degree of care is necessary to avoid injury to others under the conditions that prevail on a highway."

In this discussion of the law of negligence, we have considered the constitutional objections raised. The negligent homicide law does not suspend or repeal existing statutes governing the operation of automobiles; it does not deprive one of life, liberty, or property without due process of law; it is not an *ex post facto* law, and the law of any particular cause can be declared or known before the offense described in the act has been committed; it does not withhold information from the accused as to the nature of the accusation against him; it does not delegate legislative powers to the jury, or give a judicial department of the government any legislative powers. With the words "shall be a question of fact for the jury" eliminated, the act is valid and constitutional.

The order of the lower court quashing the indictment and discharging the prisoner is set aside. The

lower court is directed to proceed to try the respondent under the indictment.

WIEST, C. J., and CLARK, SHARPE, and NORTH, JJ., concurred with BUTZEL, J.

McDONALD and POTTER, JJ., concurred in the result.

FEAD, J. (*concurring.*)   In view of the purport now given the act, I concur in reversal.

I concur on the further ground that the constitutionality of the act was settled in *People* v. *Maki,* 245 Mich. 455, although the court was there equally divided, as fully as though it had been so held by a majority of the justices, and that the case is authority unless and until overruled by a majority of the court.

The validity of an act of the legislature should not be subject to the general rule that decision by an equally divided court affirms the judgment but constitutes no precedent.   Such a decision should be held to be a precedent in support of the constitutionality of an act, whether the question was presented to this court upon a judgment in favor of or against its validity.

I have found no authority for this proposition nor against it.   I think it is sound, because of its harmony with the rule that all presumptions are to be resolved in favor of constitutionality, and a law will not be declared invalid unless it is clearly so, because it obviates the deplorable situation of an act, especially a criminal law, being enforceable in some circuits and of no effect in others, but principally because it accords respect to the acts of the other two co-ordinate branches of the government.

BUTZEL, POTTER, SHARPE, and NORTH, JJ., concurred with FEAD, J.