STATE, Respondent, v. NUZUM, Appellant.

(234 N. W. 665.)

(File No. 6837. Opinion filed January 30, 1931.)

*Atwater & Helm,* of Sturgis, for Appellant.

*M. Q. Sharpe,* Attorney General, and *R. F. Drewry,* Assistant Attorney General, for the State.

BROWN, J. Defendant appeals from a judgment of conviction for manslaughter in the first degree and from an order denying a new trial.

The information was in four counts. The first charged defendant with murder committed without design to effect the death of any particular individual, but by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, by recklessly driving an automobile on a public highway, thereby colliding with another automobile and causing the death of Garfield Simons, the driver thereof. Count 2 charges the killing of Simons by the same means while defendant was engaged in the commission of a misdemeanor, namely, the transportation of intoxicating liquor in the county of Meade and state of South Dakota. Count 3 charges the killing of Simons in the same collision by defendant operating an automobile on a public highway while under the influence of intoxicating liquor, and count 4 charges the killing of

Simons in the same collision by defendant while engaged in a misdemeanor, namely, driving an automobile upon a public highway in a careless and imprudent manner and at a dangerous rate of speed. The jury returned a verdict of guilty under count 4, and separate verdicts of not guilty under each of counts 1, 2, and 3 of the information.

Defendant's demurrer to the information and to each of the several counts thereof was properly overruled. Each count describes one and the same public offense, and contains a statement of every material ingredient of the offense, and the offense charged is certainly designated in such a manner as to enable a person of common understanding to know what is intended.

At the close of the evidence on behalf of the state, defendant moved that the state be required to call three other witnesses, Paul Stewart, Clifford Gleason, and Elmer King, who were said to be eyewitnesses of the collision. The motion was properly denied. State v. Kapelino, 20 S. D. 591, 108 N. W. 335. Defendant then moved the court to advise the jury to return a verdict of not guilty as to each count in the indictment, which motion was denied. This motion for an advised verdict was renewed at the close of all the evidence and again denied, whereupon defendant moved that the state be required to elect upon which of the four counts in the information it would rely for a conviction. Both motions were properly denied. There was evidence sufficient to sustain a conviction on one or more of the counts in the information. To have advised a verdict of not guilty would have been clearly erroneous. We may further observe that in this state it is never error for the trial court to refuse to advise a verdict of not guilty. State v. Drapeau, 45 S. D. 507, 189 N. W. 305; State v. Tescher, 50 S. D. 32, 208 N. W. 164.

The right of the state to charge in one information two or more different offenses connected together in their commission, or different statements of the same offense in different counts, under Rev. Code 1919, § 4720, as amended by chapter 143 of the Laws of 1927, was very thoroughly considered by this court in an opinion by Judge Campbell in State v. Fox, 228 N. W. 382. The construction placed upon section 4720 in that opinion, to which we adhere, completely vindicates the rulings of the trial court on the objections to the information in the present case and on the motion to require an election.

On Sunday afternoon July 24, 1927, a ball game was going on near Enning post office in Meade county. Defendant, who lived in the neighborhood of Plainview, between twenty and thirty miles east from Enning, along with some others planned to attend the ball game. Defendant left his home shortly after 1 o'clock in company with one referred to in the testimony as "Skinny" Johnston, and went to Marcus, about ten miles from Plainview, and considerably off the direct road between Plainview and Enning. At Marcus defendant and Johnston fell in with some others, among whom were Frank Johnston, brother of Skinny, Jim Hamley, and Gearheart Orvedahl. The party went to the house of Frank Johnston in Marcus and had a convivial time, drinking intoxicating liquor and engaging in loud talking. They had both beer and whisky. While thus engaged, their talk was so boisterous and profane that Letta Sala, whose hotel was but a few feet from Johnston's house, asked Orvedahl to close the door of Johnston's house so that she would not be annoyed by the swearing. Defendant admits that he heard Mrs. Sala make this request of Orvedahl. He says, "There was not any considerable amount of loud talking, swearing and boisterous conduct while we were there."

About 4 o'clock in the afternoon, or possibly a little later, the party left the Johnston house in Marcus to go to the ball game. When they started, defendant and Orvedahl rode in defendant's new Chevrolet coupe driven by defendant. Hamley and Johnston rode in Hamley's car. Defendant had eight bottles of beer on ice in a pail in his car. When they got within three or four miles of the ball grounds, the game was over, and they began meeting people who had attended the game, and were returning in cars to their homes. Quite a number of these returning spectators of the game testified that before meeting defendant they observed his car coming at a very high rate of speed. Most of them estimated his speed at fifty miles an hour or better, and said that his car was going irregularly from one side of the road to the other. One witness testified that it was "wobbling" from one side of the road to the other; another that it was "weaving" from side to side; and still another that it was "veering" from one side of the road to the other. Several of these witnesses testified that for their own safety they took to the ditch as defendant's car approached.

About a mile and a half east from the ball grounds there was

a slight hill or elevation in the highway. Garfield Simons and two youths named Howie were returning from the ball game in a Ford roadster driven by Simons. As they were nearing the top of this elevation going east, defendant's car came over the top going west, and crashed into Simons' car, injuring Simons so that he died a few minutes later at the place of collision, and to some extent injuring defendant and "Skinny" Johnston, who at the time of the collision were traveling in defendant's car. A car driven by Paul Stewart had preceded Simons' car on the road for some distance, and, after the collision, was two and a half or three rods ahead of the wrecked cars of Simons and defendant. Stewart's car was also damaged at the time of the occurrence. The Howies testified that they had driven behind Stewart's car nearly all the way from the ball grounds, and that they were making no attempt to pass Stewart, but that they were from two and a half to three rods behind him at the time of the collision. They said that both Simons' car in which they were riding and the Stewart car were on the right-hand or south side of the road, that defendant's car first struck the Stewart car, glanced off it, then swerved right into the Simons car. After the collision, the Simons car and defendant's were some three rods further down the hill than the Stewart car, and were so tightly jammed and locked together that it required a number of men swaying the cars sideways to get them apart.

Stewart, and also some other witnesses who were in a car behind Simons' car, testified that Simons was trying to pass the Stewart car and had got ahead of it and was cutting in in front of it when the collision took place, and that the damage to the Stewart car was caused either by Simons' car being forced against it or by defendant's car having in some way climbed over the Simons car and come down on the Stewart car from above. This latter theory seems entirely incompatible with the manner in which the two cars of defendant and Simons were interlocked down the hill below the Stewart car, and also with the fact (which is undisputed) that there was no scratch or other injury on the right side of Simons' car, which was the side which would inevitably have come in contact with the Stewart car had it been forced against the Stewart car by the collision while turning in in front of that car. In any event, whether or not the collision was caused by the carelessness or recklessness of defendant was a question of

fact for the jury, and they have determined it adverse to defendant, and as there is abundant evidence to support the verdict in that respect, we cannot interfere.

Defendant's brief and abstract contains about four hundred fifty printed pages and ninety assignments of error. It is obvious that we cannot take these up in detail, but we have carefully read the entire record and argument and considered every assignment of error. A number of these relate to receiving, over defendant's objection, evidence of the drinking at Johnston's house in Marcus, particularly the evidence of loud talk and profanity, because it was not shown that such loud talk and swearing was uttered by defendant. Defendant was one of the party, and it was competent to show the conduct of the party as a whole. Defendant says that while in the Johnston house he drank two bottles of beer (from which he says he felt no "kick"), and took one drink of whisky, about half a pint between six of them. Defendant was a member of the party of his own choice, and by his own volition. Evidence of boisterous conduct of the party, taken in connection with evidence of defendant's personal conduct continuously thereafter up to the moment of the collision, his driving through White Owl at an estimated speed of fifty miles an hour, stopping on the way to drink beer, and offer beer to others, resuming his wild career with auto horn squawking "a sort of continuous squawk" as they met (not overtook) and passed other cars, wobbling from side to side of the road, causing others to crowd the ditch for safety—all tended to throw light on whether or not he was driving recklessly and without regard to the safety of others at the moment of the collision.

Another group of assignments relate to the testimony of witnesses who met defendant within one or two miles from the place of accident. Argument is that the distance made the evidence too remote; that the fact that defendant was driving at fifty miles an hour or more some one to three miles east of the place of collision had no tendency to prove that he was driving at an excessive rate of speed at the time of the collision. We are satisfied that the evidence was not too remote, and that it was properly admitted. One witness testified that defendant went through White Owl at a speed in excess of fifty miles an hour; another met him about a mile from the place of collision, and estimated that he was going some forty-

five to fifty miles an hour. Another going west was passed by defendant at a speed estimated by the witness of about fifty miles per hour; another traveling west with his wife and seven children in a Ford touring car, going about thirty miles an hour, was overtaken and passed by defendant "as though I was standing still." This was about a mile and a half east of the place of collision. This witness says he saw defendant's car for about half a mile after it passed, before it disappeared from sight, and that it was "part of the time on one side of the road and part on the other." Another witness who met defendant about eighty rods east of the place of collision, and who saw him approach from a distance of between half and three-quarters of a mile, testified that he was going awful fast, probably about fifty miles an hour, and veering from one side of the road to the other; another who met him near the top of the hill said he went by like a flash, and that the crash of the collision followed almost immediately thereafter. We are satisfied that all of this evidence was properly admitted.

Some of the witnesses testified that, when he met them, one or other of the occupants of defendant's car yelled at them, while another testified that as defendant was approaching them his horn kept going all the time. The evidence was properly received as bearing on the reckless manner in which defendant was driving. When the party started out from Marcus on their way towards Enning, Orvedahl was with defendant in his car and Johnston with Hamley. When they were several miles out from Marcus, defendant's car swerved, and came near the edge of the ditch by the roadside. Orvedahl remonstrated with defendant on the speed at which he was driving and desired to get out of defendant's car. Soon afterwards the party stopped, and Orvedahl and Johnston changed places, Orvedahl going in with Hamley and Johnston with defendant. After they had gone through White Owl a short distance, they stopped, and Orvedahl got out and announced his intention of walking back to White Owl. Defendant urged him to go on with the party, but Orvedahl declined, and walked back on foot to White Owl. At some part of the way between Marcus and the place of the collision, Hamley's car ran into and killed a calf, and the state's attorney asked one witness for the prosecution a question designed to bring out that fact, but defendant's objection thereto was sustained. Defendant now argues that the mere asking of this ques-

tion was such misconduct on the part of the state's attorney as to require a reversal. We think otherwise. It is not at all certain but that the question might have been properly allowed. Both cars were participating in the wild race. At one stage Hamley's car passed defendant's, whereupon defendant speeded up in an apparent effort to pass Hamley again. Defendant knew that Hamley had run into and killed the calf, for they all stopped when that occurred. This was before they came to White Owl. There was testimony that defendant went through White Owl at a speed estimated to be over fifty miles an hour. The fact that prior to this time he knew that his companion in the drive, Hamley, had run into and killed a calf, should have been some warning to him to go carefully, and we think that the fact that the calf had been killed by Hamley running into it, and that defendant had knowledge of this fact, might well have been admitted as bearing on the question of defendant's carelessness in continuing to drive at such a high rate of speed thereafter. In any event, we are satisfied that the mere asking of the question by the state's attorney cannot be characterized as misconduct.

Complaint is made of the admission of the opinions of witnesses as to the speed at which defendant was driving. All witnesses whose opinions of speed were received had years of experience in driving and riding in motor cars. Their opinions were competent on the question of speed. State v. Auerback, 108 Ohio St. 96, 140 N. E. 507; Pemberton v. Fritts, 56 S. D. 374, 228 N.W. 409; Judd v. Rudolph, 207 Iowa, 113, 222 N. W. 416, 62 A. L. R. 1174; Stehouwer v. Lewis, 249 Mich. 76, 227 N. W. 759; Gerbing v. McDonald (Wis.) 229 N. W. 860.

Another group of assignments relates to the refusal of the court to give certain instructions requested by defendant. Two of these assignments are abandoned in the argument. The others in substance and effect request the court to charge that, if deceased failed to use and exercise the precaution and care that he was required to use, then defendant could not be found guilty, and, in connection with the refusal of the court to give the requested instructions, plaintiff assigns as error the giving by the court of the following instruction, No. 23½:

"Some evidence has been introduced tending to show that the deceased was negligent in the operation of his own automobile.

I charge you as a matter of law that if you are satisfied beyond a reasonable doubt that the defendant Thomas Nuzum caused the death of Garfield Simons, Jr., by driving the Nuzum automobile against the car of the deceased in a reckless and negligent manner, and if you further find that such conduct on the part of the defendant was the proximate cause of the death of Garfield Simons, Jr., then the fact, if it should be a fact, that the deceased may have been negligent in the operation of his own automobile would constitute no defense."

This instruction was a correct statement of the law. Contributory negligence of the person killed is no defense to a prosecution for homicide. 29 C. J. 1154; State v. Kline, 168 Minn. 263, 209 N. W. 881; State v. Thomlinson (Iowa) 228 N. W. 80; People v. McMurchy, 249 Mich. 147, 228 N. W. 723. Some of defendant's requested instructions presented the view that, notwithstanding defendant might be under the influence of liquor or guilty of gross negligence, yet, if Simons' death was caused by his own recklessness, defendant could not be held liable therefor, and he should be found not guilty. These requests were completely covered by an instruction given by the court, No. 23B, as follows:

"If you believe from the evidence in this case that the death of Garfield Simons, Jr., was caused by his own act or omission and not by any fault of the defendant, then and in that case you could not find the defendant guilty even though you did find that at the time the defendant was in commission of some act which violated certain statutes of the State of South Dakota."

The court further charged the jury that, if they should find that the collision which resulted in the death of Simons could not have been avoided by the defendant in the exercise of ordinary care, whether under the influence of intoxicating liquor or not, then their verdict should be for defendant, and they should acquit him. The charge of the court as a whole was a clear and plain statement of the law applicable to the facts in the case. It carefully guarded every right of the defendant, and fully covered every requested instruction that embodied a correct statement of the law.

The defendant had throughout a fair and impartial trial, and the verdict of the jury is amply sustained by the evidence. The judgment and order denying a new trial are affirmed.

POLLEY, P. J.   I concur in the affirmance of the judgment appealed from.

CAMPBELL and BURCH, JJ., concur in the result.

ROBERTS, J., disqualified, not participating.

CAMPBELL, J.   There are numerous statements in the foregoing opinion with which I am not in agreement.   I think, however, that the record fails to show any error prejudicial to appellant, and that the evidence is ample to sustain the verdict, and the judgment and order appealed from should be affirmed.