#24336-a-DG

**2007 SD 124**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

   v.

KARYL MICHELLE CONDON,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE GLEN A. SEVERSON
Judge

* * * *

LAWRENCE E. LONG
Attorney General

STEVEN R. BLAIR
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellee.


MARK KADI
Office of the Public Advocate
Sioux Falls, South Dakota                 Attorney for defendant
                                          and appellant.

* * * *

CONSIDERED ON BRIEFS
ON OCTOBER 1, 2007

OPINION FILED **12/05/07**

#24336

GILBERTSON, Chief Justice

[¶1.]     On September 2, 2004, Karyl Michelle Condon (Condon) was indicted by a Minnehaha County grand jury on one count of grand theft. A jury trial was held in the South Dakota Second Judicial Circuit on January 24 and 25, 2005, after which Condon was found guilty of the charge.[1] On July 12, 2006, Condon filed a motion for a new trial pursuant to SDCL 15-6-59(a)(4). The trial court heard the motion on July 24 and September 15, 2006. The trial court denied Condon's motion and she was thereafter sentenced to eight years in the penitentiary with one year conditionally suspended. We affirm.

**FACTS AND PROCEDURE**

[¶2.]     At around 3:00 p.m. on June 28, 2004, Miguel Comparan (Comparan) was visiting with Adriana Lores (Lores) the cashier at a Mexican grocery store in Sioux Falls, South Dakota, Nikki's La Mexicana (La Mexicana), after completing his shopping. While they were visiting, a young woman, later described by Comparan and Lores as an "American Indian," 5' 2" to 5' 3", weighing about 200 lbs., came into the store and asked Lores for some "fajita meat." Lores, who was working alone, left the cashier's counter and walked to the meat department in the back of the store with the woman. Comparan then proceeded to leave the store.

[¶3.]     As Comparan was exiting through the front door, a second woman, who he described as being an "American Indian," "who looked like she was tall" and

---

1.     After the jury verdict Condon pleaded guilty to a habitual criminal information filed by the Minnehaha County State's Attorney.

"a little obese" was about to enter the store.[2] After leaving the store, Comparan got into his car on the passenger side because a blue Ford Taurus had parked close enough to the driver's side of his car that he could not enter on that side. Comparan had just sat down in his car and was about to check the contents of his grocery bag against his shopping list when he noticed the second Indian woman emerging from the store with a handful of jewelry.[3] At Condon's trial, Comparan testified that when he looked at the woman, she pulled the jewelry behind her back and then got into the driver's side of the blue Ford Taurus parked next to him. Comparan stated that he then backed out of his parking space and moved his car in front of the neighboring Subway restaurant.

[¶4.] Sensing that something wrong had occurred in the grocery store, Comparan went back to La Mexicana to inquire as much with Lores. When he entered the store, the first woman was paying for her fajita meat and was about to leave. Comparan testified that after that woman left, she got into the blue Ford Taurus on the passenger side and rode away with the woman who had emerged from La Mexicana with the handful of jewelry.

[¶5.] Comparan asked Lores if anything was missing from the jewelry case that sat near the front door of the store. The two observed that there was an area in the case that had been cleared of jewelry. Comparan then left La Mexicana to

---

2. At Condon's trial, Comparan testified that at that time he also observed a third woman standing outside in the vicinity of La Mexicana.

3. At Condon's trial, Comparan described the handful of jewelry as "a bunch" of "bracelets and necklaces and stuff like that."

follow the blue Ford Taurus. Within several blocks he lost the vehicle, so he then returned to La Mexicana. Since Lores did not speak much English, Comparan called 911 to report the theft.

[¶6.] Sioux Falls Police were dispatched to La Mexicana and Officer Richard Millette (Millette) interviewed Comparan and Lores, taking their descriptions of the two women.[4] Later that day Comparan spoke to one of La Mexicana's owners, Michelle Reta (Reta). Comparan's description of the thief was consistent with that of Condon, who Reta had barred from the store for issuing bad checks. Reta then advised Millette that she thought Condon might be the thief.[5]

[¶7.] On June 29, 2004, Detective Larry Heitkamp (Heitkamp) was assigned to follow up on Millette's preliminary investigation. Based on Millette's report, Heitkamp put together a six-person photo lineup that included a picture of Condon.[6] On July 2, 2004, Heitkamp interviewed Comparan and showed him the

---

4. Lores was unable to identify the woman who stole the jewelry because she was with the first woman in the rear of the store and did not observe the theft.

5. Reta reported that approximately seven 14-carat gold bracelets and one 14-carat gold Geneva brand watch had been taken with a total value of $3,460.

6. At Condon's trial, Heitkamp described a photo lineup as a law enforcement tool in which a photo of a known suspect is included with filler photos of other similar appearing persons. The lineup is then presented to witnesses or victims for possible identification of the suspect. Heitkamp went on to explain that his procedure in presenting a photo lineup is to "tell the individuals to look at the photo lineup and that they are not obligated to pick anyone out of the photo lineup and . . . ask them to be 100-percent certain before they identify anyone out of a photo lineup."

photo lineup. Comparan identified the photo of Condon as matching the person that he saw leaving La Mexicana with the handful of jewelry.

[¶8.] Condon was indicted on one count of grand theft in violation of SDCL 22-30A-1 and SDCL 22-30A-17. At Condon's trial on January 24, 2005, the State called Comparan, Lores, Reta and Heitkamp. On January 25, the jury returned a guilty verdict against Condon. Thereafter, she absconded and was not apprehended until June 6, 2006.

[¶9.] While in custody at the Minnehaha County Jail awaiting sentencing, Condon allegedly was informed by fellow inmates that Latasha Rodriquez (Rodriquez) was the person responsible for the jewelry theft at La Mexicana on June 28, 2004.[7] On June 12, 2006, Condon informed defense counsel that fellow inmate Gaylina Jandreau (Jandreau) told her that she had been outside La Mexicana at the time of the June 28, 2004 jewelry theft and that she had observed Rodriquez, a person that Jandreau claimed had an appearance similar to Condon's, leaving the store with jewelry in hand. Condon asked Jandreau to write out her account of the theft and Jandreau allegedly complied.

[¶10.] A second inmate, Wendy Yanacheak (Yanacheak) allegedly had mistaken Condon for Rodriquez at the county jail. Yanacheak conveyed to Condon that she had a friend, Cameron, who had a daughter named Monica who was a

---

7. In June 2006, both Condon and Rodriquez were incarcerated at the county jail. Their respective booking sheets revealed that both were American Indians with black hair and brown eyes. Condon was described as being 5' 7" and weighing 180 lbs. Rodriquez was described as being 5' 4" and weighing 225 lbs.

friend and roommate of Rodriquez's. Yanacheak claimed to have been present when Monica offered Cameron a piece of jewelry and that Cameron had refused the jewelry because she thought it may have been acquired illegally.

[¶11.]     Based on this new information, Condon filed a motion for a new trial on July 12, 2006. The trial court heard the motion on July 24, 2006. Yanacheak was present and testified at the hearing. Condon attempted to produce Jandreau, but she did not appear. Alternatively, Condon offered Jandreau's handwritten statement as evidence of her account. Supporting its decision with oral findings and conclusions, the trial court refused to allow the statement, but granted Condon a continuance until September 12, 2006, to produce Jandreau. Meanwhile, Rodriquez appeared at the July 24 hearing and testified that while she did visit Sioux Falls for a two-week period in July 2004, she otherwise had not been in Sioux Falls until she moved there on December 18, 2005. She further testified that she did not meet Monica until that time and that she had never given Monica any jewelry.

[¶12.]     The trial court granted a second continuance until September 15, 2006, but Condon was still unable to produce Jandreau. When the court reconvened at that time, Condon's motion for a new trial was denied and an oral sentence was pronounced. The trial court entered its judgment and sentence on November 1, 2006, and on November 27, entered findings of fact and conclusions of law in connection with its denial of Condon's motion for a new trial.

[¶13.]     Condon appeals raising the following issues:

1.     Whether the trial court erred in noting for the record testifying witnesses' in-court identifications of Condon.

2.     Whether the trial court erred when it allowed the State to question Comparan as to Condon's nationality and his ability to differentiate between persons of American Indian and Mexican descent.

3.     Whether the trial court abused its discretion at the motions hearing by refusing Condon's proffer of a handwritten statement as an exception to the statutory hearsay rule.

4.     Whether the trial court abused its discretion by denying Condon's motion for a new trial pursuant to SDCL 15-6-59(a)(4).

**STANDARD OF REVIEW**

[¶14.]     This Court applies the de novo standard when reviewing appeals that assert an infringement of a constitutional right. State v. Asmussen, 2006 SD 37, ¶11, 713 NW2d 580, 586 (citing State v. Dillon, 2001 SD 97, ¶12, 632 NW2d 37, 43 (citing State v. Stanga, 2000 SD 129, ¶8, 617 NW2d 486, 488)). "The trial court's evidentiary rulings are presumed correct and will not be overturned absent an abuse of discretion. 'An abuse of discretion refers to a discretion exercised to an end or purpose not justified by and clearly against reason and evidence.'" *Id*. ¶13 (citations and quotations omitted).

[¶15.]     We apply the abuse of discretion standard to the trial court's determination of whether to admit hearsay evidence. *Matter of* R.S.S., 474 NW2d 743, 749 (SD 1991). While we review the trial court's findings of fact under the clearly erroneous standard, we give no deference to its conclusions of law and thereby apply the de novo standard. State v. Runge, 2006 SD 111, ¶9, 725 NW2d

589, 592 (citations omitted). Having not observed witness testimony, we defer to the trial court's assessment on the credibility of witnesses. *State v. Piper*, 2006 SD 1, ¶84, 709 NW2d 783, 815 (citing *State v. Burtzlaff*, 493 NW2d 1, 4-5 (SD 1992)). Abuse of discretion is also the standard applied when reviewing whether the trial court should have granted a motion for a new trial. *State v. Crawford*, 2007 SD 20, ¶14, 729 NW2d 346, 349 (citing *State v. Perovich*, 2001 SD 96, ¶11, 632 NW2d 12, 15).

## ANALYSIS AND DECISION

[¶16.]  **1.  Whether the trial court erred in noting for the record testifying witnesses' in-court identifications of Condon.**

[¶17.]  At Condon's trial on January 24, 2005, the State asked Comparan if the woman that he saw coming out of La Mexicana with the jewelry in hand was present in the courtroom. Comparan answered "[y]es" and when asked where she was seated and what she was wearing, he stated that she "[i]s in front of us [wearing] red." Thereafter, the State asked the trial court for "the record [to] reflect that [the] witness . . . identified the Defendant." Over Condon's objection, the trial court granted the State's request by replying, "It's noted." Later, the State asked Reta if she knew Condon and if Condon was present in court, where she was seated and what she was wearing. After Reta pointed out Condon in the courtroom and that she was wearing "a red sweater." The trial court, again at the State's request and over Condon's objection, "noted" for the record that Reta identified Condon.

[¶18.]  Condon argues that the trial court erred by noting for the record Comparan's in-court identification of Condon as the person he saw leaving La Mexicana with jewelry in hand and Reta's in-court identification of Condon as the

person she knew by that name. Condon asserts that her right to a fair trial, guaranteed by the Sixth Amendment to the United States Constitution and Article 6, Sections 6 and 7 of the South Dakota Constitution, was violated by these notations for the record. She further asserts that these notations constituted judicial notice of a contested fact in violation of SDCL 19-10-2,[8] testimony by the trial court in the role of a witness in violation of SDCL 19-14-5,[9] or non-impartial bolstering of State's witnesses. We disagree.

[¶19.] This Court has not specifically addressed these contentions raised by Condon. To secure a conviction, the State must identify the defendant as the party completing all requisite elements of the crime. It has perhaps been intuitive that when that identification, at least in part, is attributable to an in-court identification of the defendant, the State is also charged with the responsibility of preserving that identification for the record.

[¶20.] We have recognized that a courtroom identification is not necessary when the evidence is sufficient to establish the inference that the defendant is the

---

8.      SDCL 19-10-2 provides:

A judicially noticed fact must be one not subject to reasonable dispute in that it is either:

(1) Generally known within the territorial jurisdiction of the trial court; or

(2) Capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

9.      SDCL 19-14-5 provides:

The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point.

(continued . . .)

person who committed the crime. State v. Sonen, 492 NW2d 303, 307 (SD 1992) (citing United States v. Morrow, 925 F2d 779, 781 (4thCir 1991) (citing United States v. Capozzi, 883 F2d 608 (8thCir 1989))). However, the instant case does not represent such an example. Reta's testimony that Condon had been barred from La Mexicana for passing bad checks was used to establish a motive for the theft and her in-court identification of Condon was helpful in that regard. However, Comparan's testimony about his eye-witness account of the theft and his in-court identification of Condon as the perpetrator, were pivotal in linking Condon to the crime. For the State to preserve these in-court identifications for appellate review, it was necessary that the trial court note them for the record.

[¶21.] While we have not previously addressed the issue, other courts have concluded recognition of a witness's in-court identification is not error, but if anything, is necessary to establish the record of a critical aspect of trial for appellate review. *See* State v. Jacob, 574 NW2d 117 (Neb 1998); State v. Privat, 556 NW2d 29 (Neb 1996); State v. Rybolt, 650 P2d 1258 (ArizCtApp 1982), *overruled on other grounds by* State v. Diaz, 688 P2d 1011 (Ariz 1984); Echols v. State, 517 SW2d 18 (TennCtApp 1974); State v. McMurry, 513 P2d 953 (ArizCtApp 1973).

[¶22.] As in the instant case, the defendant in *Privat* claimed the trial court erred by noting for the record the prosecution's witnesses' in-court identifications of him. 556 NW2d at 35. In response to the state's request that witnesses' in-court identifications be reflected in the record, the trial court responded, "The record will so reflect." *Id*. at 36 The defendant argued that the trial court's statement

_____

(. . . continued)

bolstered the credibility of the prosecution's witnesses and effectuated judicial notice of a contested fact. *Id*. at 35. In *Privat*, the Nebraska Supreme Court rejected the defendant's assertion of error, deciding that the trial court's statement for the record did not constitute a comment on a fact in controversy or an opinion as to the significance or credibility of witness testimony. *Id*. at 36. Moreover, in *Privat*, the court specifically held that the subject statement in no way invaded the province of the jury by establishing any element of the charged crime.[10] In conclusion, the court in *Privat* opined that trial court's notation for the record of the in-court identifications was merely "an articulation of the obvious for purposes of appellate review."[11] 556 NW2d at 244; *see also Rybolt*, 650 P2d at 1263-64 (holding

---

10.   Underlying this holding was the Nebraska Supreme Court's observation that the defendant never claimed the in-court identifications were of someone else or incorrect in any way. We note that this circumstance from *Privat* is consistent with the instant case in that Condon did not allege another person was responsible for the jewelry theft until almost 17 months after the trial.

11.   In reviewing the Nebraska Supreme Court's opinion in *Privat*, we consider its recitation of the trial court's discussion with the prosecuting attorney to be illustrative of the purpose for creating a record of a witness's in-court identification. The following exchange took place during side-bar:

[TRIAL COURT:] Let me touch on something different. Mr. Kelly, what good does it do to have a witness, when you ask them to see that person in the courtroom for them to respond: Yes, I do. He's wearing a gray jacket and white shirt, sitting over there. What good does that do? What relevance does that have to do with anything?

[PROSECUTING ATTORNEY]: Well, Judge, in my career I've had five or six different court judges tell me five or six different ways that I'm to identify the defendant. I've had several judges specifically tell me that I'm not to comment on the record or to ask that the record will reflect the defendant as being identified. And, so, for that-I do not ask that question. . . .

[TRIAL COURT]: Well, be that as it may. *When she says he's sitting over*

(continued . . .)

#24336

that the trial court's recognition of witness's in-court identification did not

constitute a statement of opinion on the evidence, but simply established for the

record a fact that had occurred at trial); *Echols*, 517 SW2d at 22-23 (holding that it

was necessary for the trial court to let the record show the witness's in-court

identification of the defendant because the bill of exceptions could not otherwise

show that the defendant had been pointed out by a witness and that by creating

such a record the trial court did not effectuate a comment on the evidence);

---

(. . . continued)

> *there, how do I know that he isn't sitting back in the spectator gallery as a spectator?* **That doesn't help the appellate court at all.** You don't even have her-have him sitting at counsel table, your counsel table, theirs, or anywhere else. It doesn't mean anything.
>
> That's completely aside from whether you ask the Court to-to have the record reflect that she's identified the defendant. If you ask me to have the record reflect that, I will do that.
>
> But completely aside from that, *her response is he's sitting over there in a gray jacket. Doesn't mean anything.*
>
> [PROSECUTING ATTORNEY]: I understand. And I'll ask the question. But, I think it does have meaning on the trial level, because the triers of fact are there to make the observations. Whether or not it gets to the appellate level, I suppose I leave up to the defense attorneys.
>
> [TRIAL COURT]: Well, but it may have some relevance here.
>
> [PROSECUTING ATTORNEY]: Yes, sir.
>
> [TRIAL COURT]: **You have to keep in mind the record.**
>
> *Id.* at 32-33 (emphasis added).

-11-

*McMurry*, 513 P2d at 957 (holding it was not error for the trial court to establish for the record the witness's in-court identification of the defendant because the trial court's statement, "The record may so reflect" could in no way be construed to express an opinion on the evidence).

[¶23.]    In *Jacob*, the defendant alleged error where the trial court noted for the record the prosecution's witness's in-court identification of the defendant.    The defendant argued that the court's statement, "The record will so reflect [the witnesses' identification of the defendant]" constituted testimony as a witness by the trial court.  574 NW2d at 136.  In affirming the conviction, the Nebraska Supreme Court found no merit in the defendant's assignment of error.

[¶24.]    In the instant case, the State requested that the in-court identifications of Condon, by Comparan and Reta, be reflected in the record.  The trial court's statement "It's noted" on those two occasions cannot be construed to be testimony as to an opinion on the evidence, statements as to the credibility of State's witnesses or judicial establishment of an otherwise contested fact elemental to the crime of grand theft.  Rather, we conclude that the trial court merely established for the record facts that occurred at trial – the in-court identifications of Condon by Comparan and Reta – that could  not otherwise be observed on review by this Court.  *See Rybolt,* 650 P2d at 1263-64.  Therefore, we conclude that the trial court committed no error in regard to this issue.

[¶25.]    **2.    Whether the trial court erred when it allowed the State to question Comparan as to Condon's nationality and his ability to differentiate between persons of American Indian and Mexican descent.**

[¶26.]    During the State's case-in-chief, Comparan was asked, over defense counsel's objection, if he had an opinion as to the nationality of Condon. He was also asked whether he could differentiate American Indians from Mexicans. Condon asserts that the questions were irrelevant and prejudicial injections of race into the proceedings and were designed to elicit Comparan's subjective perception of the character of American Indians as a whole in violation of the Fourteenth Amendment to the United States Constitution. In support of this assertion, Condon cites *Brown v. Board of Ed.*, 347 US 483, 495, 74 SCt 686, 692, 98 LEd 873 (1954) (holding that racial segregation in public education is a violation of the equal protection of the laws guaranteed by the Fourteenth Amendment). In the alternative, Condon contends that as an evidentiary matter, the line of questioning lacked adequate foundation.

*Constitutional Challenge*

[¶27.]    We must determine whether the questioning evoked racially prejudicial remarks that circumvented Condon's right to due process. Condon's challenge arises out of the following exchange:

[STATE'S ATTORNEY]:    Do you know what nationality the Defendant, whom you identified is?

[COMPARAN]:    Yes.

[STATE'S ATTORNEY]:    What nationality is this Defendant?

[DEFENSE COUNSEL]:    Objection. Foundation, Your Honor, and relevance.

[TRIAL COURT]:    Overruled.

. . .

| | |
|---|---|
| [STATE'S ATTORNEY]: | What nationality is this Defendant? |
| [COMPARAN]: | American.  She's an American Indian. |
| [STATE'S ATTORNEY]: | Are you able to tell a Mexican person from an American Indian person? |
| [COMPARAN]: | Yes. |
| [STATE'S ATTORNEY]: | What nationality was the lady that bought the meat? |
| [DEFENSE COUNSEL]: | Objection, Your Honor.  Foundation and relevance at this point. |
| [TRIAL COURT]: | Overruled. |
| [STATE'S ATTORNEY]: | What nationality was the third lady? |
| [COMPARAN]: | She was also an American Indian. |

[¶28.]     Neither the testimony in this excerpt nor Comparan's testimony *in toto* reveal any racially disparaging remarks or racial prejudice or bias that could in any way have prejudiced the jury foreclosing Condon's right to due process.  Moreover, by citing *Brown*, Condon fails in attempting to establish that this exchange violated the Fourteenth Amendment.  *Brown* struck down segregation in public schools and has nothing to do with courtroom identification.  347 US 483, 495, 74 SCt 686, 692, 98 LEd 873.  Consequently, we find Condon's constitutional challenge to be without merit.

## *Evidentiary Challenge*

[¶29.]     In addressing Condon's claim that a sufficient foundation was not established prior to eliciting lay testimony from Comparan as to the ethnic-group line of questioning, we consider our version of FRE 701, SDCL 19-15-1. This statute provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
>
> (1)     Rationally based on the perception of the witness; and
>
> (2)      Helpful to a clear understanding of his testimony or the determination of a fact in issue.

SDCL 19-15-1. The focus is based on the perception of the witness to an event, not the education or experience the witness possesses prior to the event. We also note that relevant evidence is generally admissible. SDCL 19-12-2 (FRE 402). Relevant evidence is defined as that "[tending] to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." SDCL 19-12-1 (FRE 401). However, relevant evidence may be excluded by the trial court if its "probative value is substantially outweighed by the danger of unfair prejudice." SDCL 19-12-3 (FRE 403).

[¶30.]     The rules of evidence are liberally interpreted with the intent of relaxing traditional barriers to opinion testimony. State v. Guthrie, 2001 SD 61, ¶36, 627 NW2d 401, 416 (citations omitted). A lay witness may give an opinion if he has personal knowledge of the matter. State v. Andrews, 2001 SD 31, ¶17, 623 NW2d 78, 83. Lay testimony requires no foundation. *Id.* (citing Atkins v. Stratmeyer, 1999 SD 131, ¶17, 600 NW2d 891, 897 (citations omitted)); Gerlach v.

Ethan Coop Lumber Ass'n, 478 NW2d 828, 831-32 (SD 1991) (citing State v. No Heart, 353 NW2d 43, 48 (SD 1984); United States Fire Ins. Co. v. Dace, 305 NW2d 50, 56 (SD 1981)).

[¶31.]     We have reviewed trial courts' discretionary admission of lay testimony in a broad range of contexts.  This Court has recognized that one's general health is a proper subject of lay testimony by anyone who is familiar with the person to whom it relates.  Koenig v. Weber, 84 SD 558, 174 NW2d 218, 224 (1970) (citation omitted); Moberg v. Scott, 42 SD 372, 175 NW 559, 561 (1919).  Nevertheless, we have stated that a lay witness will not be allowed to testify as to the nature of a particular disease or ailment underlying the general physical condition.  Gartner v. Mohan, 41 SD 406, 170 NW 640, 641 (1919) (citation omitted).  Similarly to testimony regarding one's general health, lay testimony as to an individual's general sanity as perceived is admissible.  Shearn v. Anderson, 74 SD 41, 48 NW2d 821, 824 (1951) (citing Jones on Evidence, 4th Ed., Sec. 364).  However, lay opinion as to whether irrational persons in general can know right from wrong is beyond the scope of perception and thus inadmissible.  State v. Leehman, 2 SD 171, 49 NW 3, 6 (1891).

[¶32.]     In a case involving the malicious poisoning of a horse, this Court held that a lay witness could testify to the poisoning where he administered some of the deceased animal's stomach contents to a hen and observed that it too died shortly after ingestion.  State v. Isaacson, 8 SD 69, 65 NW 430, 431 (1895).  Conversely, we held it improper for a lay witness to testify that the animals he sold were infected with a disease where he was not so informed by his own perceptions, but rather

came by the knowledge through inadmissible hearsay reports of blood tests taken from the animals. Olson v. Aldren, 84 SD 292, 297, 170 NW2d 891, 894 (1969).

[¶33.] We have also held that a police officer without medical expertise could give lay testimony that a victim's injuries were caused by a knife rather than a fist because the distinction between the two types of wounds is within the realm of the average person's experience. *No Heart*, 353 NW2d at 48. This Court has also concluded that expert training is not required to testify as to whether a person is under the influence of alcohol because such opinions and inferences are based on witness perception. State v. Hall, 353 NW2d 37, 43 (SD 1984); *see also* State v. Dale, 66 SD 418, 284 NW 770, 771 (1939) (citations omitted); Palmer v. Schurz, 22 SD 283, 117 NW 150, 153 (1908) (citations omitted) (recognizing no error in lay witness testimony as to observations about the degree of intoxication). Similarly, this Court has held that lay witnesses familiar with alcohol may testify to whether a liquid is intoxicating based on their perception of taste and smell. State v. Turner, 53 SD 523, 221 NW 251, 252 (1928) (citing State v. Work, 47 SD 649, 201 NW 553 (1924); Territory v. Pratt, 6 Dak 483, 43 NW 711 (1889)) (additional citations omitted). Moreover, this Court has held that lay witnesses with experience driving and observing vehicular speed are competent to testify to speed. Vermillion v. Williams, 84 SD 589, 174 NW2d 331, 333 (1970) (citing Morton v. Holscher, 60 SD 50, 243 NW 89 (1932); State v. Nuzum, 58 SD 6, 234 NW 665 (1931)). Nonetheless, we have held such testimony to be inadmissible where the lay witness pulled out in front of an oncoming car and essentially did not see the other car until impact. Pearson v. Adams, 279 NW2d 674, 677 (SD 1979); *see also*

*Williams*, 84 SD at 593, 174 NW2d at 333 (stating that the lay witness must have had an opportunity to observe the vehicle before testifying to its speed) (citations omitted).

[¶34.]    In the instant case, Comparan was 37 years old at the time of trial and was born and raised in Mexico City. Thus, he has a lifetime of experience with Mexicans and people of Hispanic descent. He testified that he came to the United States in 1984, and had lived in Sioux Falls for about 10 years. Based upon that, he claimed he was also familiar with American Indians.[12] His identifications of Condon during the theft at La Mexicana and again in court were by way of his own perception. That Comparan in court was able to testify to the appearance of an American Indian and was able to distinguish American Indians from persons of Mexican or Hispanic descent was relevant to the State's obligation to establish the identity of the perpetrator. On the day of the theft Comparan described the suspect to Millette as an American Indian. The fact that Comparan also gave this description to Reta led to the identification of a suspect that culminated in Condon's arrest and indictment. That Comparan was able to identify Condon in court as an American Indian, consistent with the descriptions he gave out of court to Millette and Reta, made more likely the fact that Condon was the person who emerged from

---

12.    According to the United States Department of Agriculture, year 2003 demographic estimates for Sioux Falls, South Dakota indicate that 3,366 American Indians were living in the city. http://www.ams.usda.gov/statesummaries/SD/MSA/MSA.pdf/SiouxFalls.pdf (last visited September 6, 2007).

La Mexicana with jewelry in hand. Consequently, we find no evidentiary ground for error by the trial court in regard to this issue.

[¶35.] **3.** **Whether the trial court abused its discretion at the motions hearing by refusing Condon's proffer of a handwritten statement as an exception to the statutory hearsay rule.**

[¶36.] On July 24, 2006, at hearing for the motion for new trial, Condon offered Jandreau's handwritten statement, as substantive evidence in lieu of Jandreau's testimony. The statement, which alleged that Rodriquez was responsible for the jewelry theft, was not sworn. It was prepared by Jandreau while she and Condon were incarcerated at the Minnehaha County Jail during the period when Condon was awaiting sentencing. Condon testified and argument was presented for the purpose of establishing a foundation for the admission of the statement as an exception to the statutory hearsay rule. However, the trial court refused to admit the statement making oral findings that it did not possess "circumstantial guarantees of trustworthiness" equivalent to those exceptions to the hearsay rule set out in statute.

[¶37.] Hearsay is generally inadmissible. SDCL 19-16-4. However, numerous exceptions to the general rule are found under SDCL Chapter 19-16. Beyond those specific exceptions, hearsay may still be admissible as provided under the residual hearsay rule, SDCL 19-16-35 (FRE 804(b)(6)),[13] when the party who

_____

13. SDCL 19-16-35 provides:

> A statement not specifically covered by any of §§ 19-16-30 to 19-16-34, inclusive, but having equivalent circumstantial guarantees of

(continued . . .)

#24336

made the statement (the "declarant") is not available to testify. We have construed

there to be five criteria that the proponent must meet, once it has been established

that the declarant is unavailable, before hearsay evidence can be admitted under

this rule:

> (1) there must be circumstantial guarantees of
>     trustworthiness;
>
> (2) the hearsay must provide evidence of a material fact;
>
> (3) the hearsay must be more probative than any other
>     available evidence;
>
> (4) the general purposes of the hearsay rules and the
>     interests of justice must be served by admission of
>     the hearsay; and,
>
> (5) the adverse party must have notice.

*R.S.S.*, 474 NW2d at 749. In addition, whether the hearsay is trustworthy is

determined by assessing five factors:

_____

(. . . continued)

> trustworthiness, is not excluded by § 19-16-4 if the declarant is unavailable
> as a witness and if the court determines that:
>
> (1) The statement is offered as evidence of a material fact;
>
> (2) The statement is more probative on the point for which it is offered than
> any other evidence which the proponent can procure through reasonable
> efforts; and
>
> (3) The general purposes of these rules and the interests of justice will best
> be served by admission of the statement into evidence.
>
> However, a statement may not be admitted under this section unless the
> proponent of it makes known to the adverse party sufficiently in advance of
> the trial or hearing to provide the adverse party with a fair opportunity to
> prepare to meet it, his intention to offer the statement and the particulars of
> it, including the name and address of the declarant.

> (1) The written or oral nature of the statement.
>
> (2) The character of the statement.
>
> (3) The declarant's relationship to the witness offering the statement.
>
> (4) The declarant's motivation in making the statement.
>
> (5) The circumstances under which the declarant made the statement.

State v. Luna, 378 NW2d 229, 238 (SD 1985).

[¶38.] In this case, Jandreau was unavailable to testify. Condon gave notice to the State of her intent to use Jandreau's statement. The State concedes that the statement contained evidence of a material fact, since it addressed the identity of the party who committed the crime. The State also concedes that in lieu of Jandreau's testimony, it was more probative than any other available evidence on this point. However, the trustworthiness of the statement was challenged.

[¶39.] Condon argues that the veracity of Jandreau's statement is born out by corroborating testimony given by Yanacheak and her claim that the statement led to the State's discovery and use at the motions hearing of Rodriquez's photo, description[14] and testimony. This argument does not relate to any of the *Luna* trustworthiness factors and is an unconvincing basis upon which to declare the statement's trustworthiness. We see no connection between the trustworthiness of Jandreau's statement and Yanacheak's alleged mistaking of Condon for Rodriquez

---

14. Rodriquez's photo and description were obtained from a June 29, 2006 Minnehaha County Sheriff's Department booking sheet. Condon alleges that her own photo and Rodriquez's are nearly indistinguishable.

or her claim that Rodriquez's roommate's mother, Cameron, was suspicious about a piece of jewelry. Nor are we convinced of the statement's trustworthiness by the fact that the State, upon learning that Condon had filed a motion for a new trial based on a claim of mistaken identity with Rodriquez, sought to discover who Rodriquez was, what she looked like and what she had to say about the matter.

[¶40.] We are compelled by the fact that Condon could not base the authenticity of Jandreau's unsworn, written statement on anything other than her assertion that the signature on the statement matched Jandreau's signature on an application for a court-appointed attorney. Providing the signature on the statement is Jandreau's, there is no evidence Jandreau wrote the text other than Condon's testimony to that effect. While Condon argues there is no evidence of a relationship between Jandreau and her or of a motivation by Jandreau that would cause her to concoct a false statement, no evidence is not necessarily evidence of absence. Finally, the materialization of a written statement emanating from the Minnehaha County Jail a year and half after Condon's conviction on grand theft charges is at best a suspicious circumstance on its face. Without more, we conclude there is evidentiary support for the trial court's oral finding that circumstantial guarantees of trustworthiness were lacking and therefore find no abuse of discretion in its refusal to admit Jandreau's statement.

[¶41.] **4.** **Whether the trial court abused its discretion by denying Condon's motion for a new trial pursuant to SDCL 15-6-59(a)(4).**

[¶42.] SDCL 15-6-59(a)(4) is a provision whereby the trial court may grant a motion for new trial where evidence, material to the movant, is newly discovered and could not with reasonable diligence have been discovered and produced at trial.

Condon's motion for a new trial was based on her claim of new evidence of mistaken identity with Rodriquez brought to her attention by fellow inmates at the Minnehaha County Jail when she was awaiting sentencing. She submits that her facial characteristics are nearly identical to Rodriquez's and that the photo on her booking sheet when juxtaposed with Rodriquez's bears out her contention. Condon also asserts that the description of the person Comparan observed leaving La Mexicana with jewelry in hand, which he told to Millette, was of an American Indian woman, 5' 2" to 5' 3" in height and weighing approximately 200 lbs. This, Condon argues is further evidence that Rodriquez was the responsible party since Rodriquez, according to her booking sheet and testimony, is 5' 4" tall and weighs about 225 lbs.[15] [16] Condon then argues that this fact coupled with her height and

15. Rodriquez's testimony at the motions hearing indicates that her weight, recorded on the June 29, 2006 booking sheet, was consistent with her weight in June 2004, when the jewelry theft occurred.

16. We note that Comparan testified at trial that the woman he observed emerging from La Mexicana with jewelry in hand that he later identified as Condon "looked like she was tall" and "a little obese." *Supra* ¶3. Whether being 5' 7" and weighing 180 lbs., like Condon, is to be *tall* and *a little obese*, is a relative question. Condon has asserted that she should be eliminated as a suspect because Rodriquez, who is 5' 4" and weighs 225 lbs., is closer to the description of the jewel thief given by Millette at the motions hearing, 5' 2" to 5' 3" and 200 lbs., than Condon who is 5' 7" weighing 180 lbs. However, from our review of the record, it would appear that the height and weight discrepancy may simply be attributable to a mistake or confusion by Millette.

   Millette's testimony as to the physical description came from the supplementary investigation report that he completed following interviews with Lores, Comparan and Reta and refers to the woman that first came in looking for fajita meat. The report provides in pertinent part:

   > **LORES, ANDRIANA,** she was working the counter by herself in the store.

   (continued . . .)

weight of 5' 7" and 180 lbs., clearly points to Rodriquez as the person matching the

description of the thief. Condon also argues that beyond her description, the

identity of Rodriquez as the true thief was corroborated by the testimony and

statements of fellow inmates conveyed to her in the county jail. [17]

[¶43.]      A defendant seeking a new trial based on newly discovered evidence

pursuant to SDCL 15-6-59(a)(4) must show:

> (1)  that the evidence was undiscovered by the movant
>      at the time of trial;

---

(. . . continued)

> . . . She advised at approximately 1535 hours she was working the front counter when an Indian female walked into the store and went back to the end of the store which is the cold meats department. Lores followed the female back to the area and was discussing items at this time.
>
> The female she described to me had dark hair, dark eyes, short, *5' 2" to 5' 3", 200 lbs*, short dark hair.
> . . . .
>
> (Emphasis added).

In Millette's report, the account of Comparan's interview offers no description of the thief other than to say she was an Indian female. The only other height and weight description in the report is the 5' 10" 180 lbs. description of Condon that Millette obtained from law enforcement's master name list when he searched that database for her after receiving her name as a possible suspect from Reta.

17.  Although Jandreau did not testify and her handwritten statement alleging Rodriquez to be the jewelry thief was not admitted into evidence, defense counsel offered argument as to why it should be admitted under the residual hearsay exception. Similarly, the trial court was aware of another hearsay writing allegedly conveying an account of a third Minnehaha County Jail inmate, Sophie Lovell. In this writing it was alleged that Rodriquez had offered jewelry to Lovell. Lovell was subpoenaed to testify at the motions hearing, but never appeared. On September 12, 2006, the trial court refused to admit this writing.

(2)  that the evidence is material and not merely cumulative or impeaching;

(3)  that it would probably result in acquittal; and,

(4)  that no lack of diligence caused the movant to discover the evidence sooner.

State v. Gehm, 1999 SD 82, ¶13, 600 NW2d 535, 540.  A motion for a new trial based on new evidence requests "extraordinary relief."  *Id*. ¶15.  Therefore, it "should be granted only in exceptional circumstances and then only if the requirements are strictly met."  *Id*.  This is not such an occasion.

[¶44.]     While the new evidence proffered by Condon is material in that it relates to the identity of the La Mexicana jewel thief, was undiscovered at the time of trial and arguably undiscoverable any earlier than when Condon brought it to light, Condon must also show that it would *probably result in acquittal*.  In denying Condon's motion, the trial court concluded that it would not.

[¶45.]     In its November 27, 2006 findings of fact, the trial court found the photographs of Condon and Rodriquez similar, but not identical.  The trial court also found that the photographs of the two women were far more similar than were their actual appearances, observed by the court at the motions hearing.  In addition the trial court noted that none of Condon's fellow inmates, who conveyed the new evidence to her, ever came forward to law enforcement with the information.  Most determinative was the trial court's finding that the circumstances surrounding the discovery of the new evidence were "highly suspicious and lacking credibility."  Moreover, it found Condon's fellow inmates and the new evidence itself to be likewise highly suspicious and lacking in credibility.  In comparison the trial court

#24336

reflected on the trial testimony of Comparan and Reta, finding it to be "very impressive, strong and credible."

[¶46.] Since there is evidentiary support for the trial court's findings underlying its decision to deny Condon's motion for a new trial, we find no abuse of discretion with regard to this issue.

[¶47.] Affirmed.

[¶48.] SABERS, KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.